# EXHIBIT 2

**PART 2**

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**Certain Digital Processors and Digital Processing Systems, Components Thereof, and Products Containing Same** | **Investigation No. 337-TA-559** |

**Order No. 24:  Issuance of Public Version of the Initial Determination**

On June 18, 2007, the Administrative Law Judge issued Order No. 23, containing a public version of the Initial Determination on the question of violation of section 337.  That public version did not include all of the redactions proposed by complainant.  Complainant has informed the Administrative Law Judge, through counsel, that it will not appeal Order No. 23. *See* Letter of counsel, dated June 20, 2007 (attached).

Consequently, attached hereto is a copy of the public version originally attached to Order No. 23, which shall serve as the final public version of the Initial Determination.

So ORDERED.

Sidney Harris
Administrative Law Judge

Issued: June 21, 2007

**PUBLIC VERSION**

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| | |
|---|---|
| **In the Matter of**<br><br>**Certain Digital Processors and Digital Processing Systems, Components Thereof, and Products Containing Same** | **Investigation No. 337-TA-559** |

**INITIAL DETERMINATION**
Administrative Law Judge Sidney Harris

Pursuant to the notice of investigation, 71 Fed. Reg. 2565 (2006), this is the Administrative Law Judge's Initial Determination in the matter of Certain Digital Processors and Digital Processing Systems, Components Thereof, and Products Containing Same, United States International Trade Commission Investigation No. 337-TA-559. See 19 C.F.R. § 210.42(a).

The Administrative Law Judge hereby determines that no violation of section 337 of the Tariff Act of 1930, as amended, has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation, of certain digital processors and digital processing systems, components thereof and products containing same by reason of infringement of 6, 9-11 or 36 of U.S. Patent No. 5,021,945.[1]

---

[1] Most of the factual findings are contained in the Opinion. Supplemental findings are in the Findings of Fact section.

the '945 patent.  Because there is no underlying direct infringement, there can be no indirect infringement as a matter of law.  Accordingly, the Administrative Law Judge finds that Biax has failed to prove by a preponderance of the evidence that Philips indirectly infringes the asserted claims of the '945 patent.

## V.     VALIDITY - New Matter & Written Description

Philips and 2Wire (collectively respondents) argue that the asserted claims of the '945 patent are invalid for failing to meet the written description requirement of 35 U.S.C. §112 ¶1 and for violating the new matter prohibition set forth in 35 U.S.C. §132(a), because the substitute specification filed during prosecution of the '945 patent impermissibly enlarged the scope of the disclosed invention.[14]  RPIB at 38; R2WIB at 18.  Specifically, respondents argue that the substitute specification enlarged the scope of the invention from: (1) requiring identical processor elements to permitting both identical and non-identical processor elements; (2) requiring context-free processor elements to permitting both context and context-free processor elements; and (3) requiring intelligence that included both a logical processor number and an instruction firing time to permitting intelligence that did not include a logical processor number and instruction firing time.  Because a

---

[14] The '945 patent issued from application serial number 07/372,247 ('247 application). The '247 application is a divisional of application serial number 06/794,221 ('221 application), which issued as U.S. Patent No. 4,847,755 ('755 patent).  During the prosecution of the '221 application a substitute specification was filed.  The '755 patent issued with the substitute specification.

The '247 application was originally filed with the identical specification and claims as the originally filed '221 application.  At the same time the '247 application was filed, the patent applicant filed a preliminary amendment that requested, *inter alia,* that the original specification be replaced with the same substitute specification filed in the '221 application and that claims 1-73 be canceled and new claims 74-116 be added.  The '945 patent issued with the original specification, but was later corrected (via certificate of correction) to include the substitute specification.

patent carries a statutory presumption of validity, respondents have the burden of showing by clear

and convincing evidence that the asserted claims of the '945 patent are invalid. See 35 U.S.C. § 282;

WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1355 (Fed. Cir. 1999).

Section 112 of the Patent Act states, inter alia, that "[t]he specification shall contain a written

description of the invention, and the manner and process of making and using it, in such full, clear,

concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which

it is most closely connected, to make or use the same." 35 U.S.C. §112 ¶1. Section 132 of the

Patent Act provides: "No amendment shall introduce new matter into the disclosure of the

invention." 35 U.S.C. § 132 (a). The written description requirement of 35 U.S.C. §112 ¶1 is closely

related to the new matter prohibition of 35 U.S.C. §132(a). Schering Corp. v. Amgen Inc., 222 F.3d

1347, 1352 (Fed. Cir. 2000). However, "the prohibition on introduction of new matter (35 U.S.C.

§ 132) is not a substitute for the written description requirement." Univ. of Rochester v. G.D. Searle

& Co., 375 F.3d 1303, 1305 (Fed. Cir. 2004).

> The written description requirement and its corollary, the new matter prohibition of 35 U.S.C. § 132, both serve to ensure that the patent applicant was in full possession of the claimed subject matter on the application filing date. When the applicant adds a claim or otherwise amends his specification after the original filing date, . . . the new claims or other added material must find support in the original specification.

TurboCare Div. of Demag Delaval Turbomachinery Corp. v. GE, 264 F.3d 1111, 1118 (Fed. Cir.

2001). Because the '247 application was filed as a divisional of the '221 application, and not as a

continuation-in-part application, the new claims and other added material in the '247 application

must find support in the originally filed specification and claims of the '221 application. See

TurboCare, 264 F.3d at 1120("Because Brandon did not file a continuation-in-part application, he

cannot rely on any alternative filing date for his newly added claim 2. . . . Consequently, claim 2 is

invalid for an inadequate written description."); see also LizardTech, Inc. v. Earth Res. Mapping, Inc., 424 F.3d 1336, 1346 (Fed. Cir. 2005) (citing Union Oil Co. v. Atlantic Richfield Co., 208 F.3d 989, 998 n. 4) (An originally filed claim can provide the requisite written description to satisfy section 112.).

### A.    Identical Processor Elements

Respondents argue that the substitute specification impermissibly enlarged the scope of the disclosed invention from requiring identical processor elements to permitting both identical and non-identical processor elements. Biax argues that it is clear from the original application that the invention is not limited to identical processor elements. CRB at 17. Although the Staff admits that it is a close-question, the Staff ultimately concludes that the evidence does not clearly and convincingly show that the original application is limited to identical processor elements. SIB at 17, 43, 44.

Each of the claims in the original application include a limitation directed to a plurality of processor elements. See JX-6 at JCFH0137-185. Respondents point to nothing in the claims, and indeed the ALJ can find no specific language in the claims, to suggest that the processor elements must be identical. To the contrary, the Staff argues that the original filed claims indicate that the original application was not limited to identical processor elements. SRB at 10. In support of its argument, the Staff points to differences in the description of the processor elements from claim to claim. Id. Specifically, the Staff notes that while some of the independent claims include a requirement that "each said processor element [be] capable of processing said transferred instruction" other independent claims do not contain such a requirement. Id. Thus, the Staff concludes that every processor element need not execute every type of instruction. Id.

The Staff's argument is tenuous at best. Although the Staff does not so state, it appears that it is relying on the doctrine of claim differentiation as the basis for its argument. "In the most specific sense, 'claim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006). Here, the Staff invokes the doctrine of claim differentiation not between an independent claim and its dependent claim, but between two independent claims. In such cases, the doctrine of claim differentiation "is a guide, not a rigid rule." Curtiss-Wright Flow Control Corp., 438 F.3d at 1381; see Hormone Research Found. v. Genentech, Inc., 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990) ("It is not unusual that separate claims may define the invention using different terminology, especially where (as here) independent claims are involved."). The Federal Circuit has stated that:

> two considerations generally govern this claim construction tool when applied to two independent claims: (1) claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous; and (2) claim differentiation can not broaden claims beyond their correct scope.

Id. (internal quotations omitted). In this case, adopting the Staff's claim differentiation argument would impermissibly broaden the claims beyond their correct scope. As discussed in detail below, the applicants' explicit statements in the originally filed application as well as the applicants' statements during prosecution limit the claimed processor elements to identical processor elements.

Having reviewed the claims, the specification is consulted. Phillips v. AWH Corp., 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[C]laims must be read in view of the specification, of which they are a part."). Respondents point to several passages in the specification that inform the analysis herein. See RPFF 292-297. In the section titled "BACKGROUND OF THE INVENTION," the applicant

-51-

states that "[t]his invention generally relates to parallel processor computer systems and, more particularly, to parallel processor computer systems having software for detecting natural concurrencies in instruction streams and having a plurality of **identical processor elements** for processing the detected natural concurrencies." JX-1 at 1:11-16 (orig. spec.) (emphasis added). Similarly, in the same section of the specification, the applicant states that in the "patent invention . . . [t]he results of this static allocation are executed on a system containing a plurality of **identical processor elements**." JX-1 at 3:65-4:13 (orig. spec.)(emphasis added). Similarly, in the "SUMMARY OF THE INVENTION," the applicant states that "[t]he present invention further executes the basic blocks containing the added intelligence on a system containing a plurality of **identical processor elements** each of which does not retain execution state information from prior operations." JX-1 at 13:52-56 (orig. spec.)(emphasis added).

In each of the above cited passages the applicant explicitly states that the invention uses identical processor elements. These statements are of particular import because in each instance the applicant is discussing the invention as a whole and not just a particular embodiment of the invention. Thus, these statements represent objective evidence that the inventors of the '945 patent believed their invention to be limited to identical processor elements.

In addition to the above cited passages, in discussing the preferred embodiment of the invention shown in Figure 21 of the '945 patent, the applicant again states that "[a]ll processor elements 640 are identical" and "[e]ach processor element is homogeneous and is capable of executing all computational and data memory accessing instructions."[15] JX-1 at 48:27, 48:46-48 (orig. spec.). Although claim terms are not generally limited to preferred embodiments, the

---

[15] "Homogenious" means "identical." See Morrison Tr. 64:21-22; Stone Tr. 580:5-7.

applicants consistent description of the processor elements as identical does lend additional support to Philips argument that the original application is limited to identical processor elements. This is especially true in light of the fact that nowhere in the original application does the patent applicant explicitly state that the processor elements can be anything other than identical. See LizardTech, Inc. v. Earth Res. Mapping, Inc., 433 F.3d 1373, 1375 (Fed. Cir. 2006)(Lourie, J., Michel, J., Newman, J., concurring)("Claims are not necessarily limited to preferred embodiments, but, if there are no other embodiments, and no other disclosure, then they may be so limited."); see also Stone Tr. 606:20-607:6.

In contrast to the explicit statements in the specification requiring identical processor elements, the Staff argues that the inventors were in possession of the invention using non-identical processor elements at the time the original application was filed. SIB at 42. The Staff bases its conclusion on the fact that the invention uses a branch execution unit ("BEU") to process all branch instructions. Id. The Staff asserts that the BEU is an example of a non-identical processor element because the BEU can only execute branch instructions and not other kinds of instructions. Id. According to the Staff, the original specification discloses that the assignment of instructions to the BEU includes the addition of intelligence indicating a logical processor number and an instruction firing time. Id. Thus, the Staff argues, "it is clear that the inventors had in their possession the subject matter at issue, viz., non-identical elements that process instructions during execution." Id. at 43.

Although the Staff's argument may appear plausible at first blush, it is only so because the Staff incorrectly frames the issue. The issue is not whether the inventors were in possession of non-identical elements that process instructions during execution, but whether the inventors were in

possession of the disclosed system for parallel processing utilizing non-identical processor elements to process non-branch instructions. Framed correctly, it is clear the use of a BEU in the disclosed invention is not evidence that the inventors were in possession of such subject matter. The Staff's notion that the inclusion of the BEU in the disclosed invention somehow supports a finding that the processor elements can be non-identical is incongruent with the fact that the original specification explicitly distinguishes between the BEU and the processor elements. In fact, in the very portion of the specification to which the Staff cites in support of its argument, the applicant states that "[i]t should be noted that the processor elements execute all non-branch instructions, while the branch execution unit (BEU) of the present invention executes all branch instructions." JX-1 at 21:15-18 (orig. spec.). Not only does this passage clearly distinguish between the BEU and the processor elements, but here again the applicant reaffirms that the processor elements must be identical by stating that the processor elements (plural) execute **all** non-branch instructions.

Having examined the specification, the prosecution history is consulted. See Philips, 415 F.3d at 1317 ("In addition to consulting the specification, we have held that a court should also consider the patent's prosecution history, if it is in evidence."). Prior to examination of the '221 application (which matured into the '755 patent), the applicants filed a Petition under 37 C.F.R. 1.102(d) for Advancement of Examination ("Petition to Make Special"). See MPEP 708.02. In the Petition to Make Special, the applicants compared and contrasted the disclosed invention to numerous prior art references the applicants' discovered during a patentability search. See JX-6 at JCFH0444-466. In distinguishing the disclosed invention from the cited references, the applicants stated that "[t]he present invention further executes the basic blocks containing the added intelligence on a system using a plurality of **identical processor elements** each of which is incapable

of retaining execution information from prior operations." JX-6 at JCFH0465 (emphasis added). Here again, the applicants explicitly state that the invention uses identical processor elements. Because the above statement is in reference to the invention as a whole it is strong objective evidence that the only thing the inventors had in their possession at the time of filing the original application was a system for parallel processing that used identical processor elements.

In addition to the intrinsic evidence of record, respondents rely on the testimony of the three inventors of the '755 and '945 patents in support of their invalidity argument. The inventors' testimony, as discussed in more detail below, provides additional context in which to resolve respondent's written description and new matter arguments.

The inventors of the '755 and '945 patents were Gorden Morrison, Christopher Brooks, and Frederick Gluck. See JX-1; JX-4. Although inventor Morrison testified that the original application was not limited to identical processor elements, (Morrison Tr. 82:3-8, 146:4-7), on cross-examination it became clear that Mr. Morrison's conclusory testimony on this point should be discounted. Contrary to his testimony on direct, at deposition Mr. Morrison explicitly agreed that the invention **required** multiple, identical processor elements. Morrison Tr. 147:2-24 (emphasis added); 152:12-17. In fact, he testified during deposition that the use of identical processor elements was extremely important to the invention.[16] Morrison Tr. 149:17-20. Also, during the depositions of inventors Brooks and Gluck, they agreed that the processor elements in the original application were disclosed as being identical. JX-27C (Brooks Depo.) at 294:20-295:4 (June 4, 2003), 103:3-

---

[16] During his direct testimony at the hearing, Mr. Morrison testified that since leaving Biax in 1987 he has worked as a consultant for Biax, and also has testified on the company's behalf. He has also received a dividend from Biax as a shareholder. In total, he has received approximately $500,000 from Biax. See Morrison Tr. 87. These facts lessen his credibility when assessing the disparity between his deposition and hearing testimony.

105:7 (April 21, 2005); JX-30C (Gluck Depo.) at 150:4-10 (April 23, 2003), 554:23-555:20 (April 25, 2003).

In addition to the testimony from the inventors, additional testimony was elicited that informs the invalidity analysis herein. Specifically, the evidence of record suggests that the difference between identical and non-identical processor elements has a significant effect on the design of a computer system, both in hardware and software. PFF232. Respondents' expert, Dr. Hwu, testified that designing a computer with non-identical processor elements simplifies hardware, but significantly complicates software. Hwu Tr. 917:10-919:6. Dr. Hwu's opinion is corroborated by the testimony of Mr. Gluck,[17] who stated at his deposition that implementing a system with non-identical processor elements would have been a hard problem to solve. PFF 233. The original specification fails to provide any disclosure regarding how the Toll software would be able to schedule instructions for execution on non-identical processor elements.[18] Philip's argument that the original specification fails to comply with the written description requirement of 35 U.S.C. § 112 ¶ 1, is greatly supported by the complexity of designing a parallel processing system capable of scheduling instructions for execution on non-identical processor elements and the total absence of any implementing disclosure.

In light of the originally filed claims and specification, the prosecution history of the original '221 application, the testimony of the inventors of the '755 and '945 patents, and the testimony of the experts in this investigation, the ALJ finds the claimed processor elements in the original '221

---

[17] Mr. Gluck is one of the inventors of the '755 and 945 patents.

[18] The substitute specification similarly fails to disclose how to implement parallel processing on non-identical processor elements. See PFF 446-447.

application are limited to identical processor elements. There is absolutely no indication in the language of the claims, the original specification or the prosecution history to suggest that the inventors ever contemplated using non-identical processor elements to execute the non-branch instructions. Far from it, the applicants' explicit statements in the specification and prosecution history make clear that the claimed processor elements were intended to be limited to identical processor elements. These clear and unequivocal statements represent objective evidence of the inventors' intent at the time the original application was filed and, in conjunction with the inventors' testimony and that of the experts in this investigation, prove clearly and convincingly that the inventors were not in possession at the time the original application was filed of a system for parallel processing that utilized non-identical processor elements to execute non-branch instructions. At the hearing respondents' expert, Dr. Smith, concurred. See Smith Tr. 1013:19-1019:23; 1024:2-5; 1027:22-1028:2. Accordingly, to the extent Biax argues in this investigation that the plurality of processor elements in the asserted claims of the '945 patent may be non-identical, the ALJ finds such an interpretation to be in violation of the written description requirement of 35 USC §112 ¶1.

Having determined that the original application is limited to identical processor elements, the substitute specification must be examined to determine whether it impermissibly enlarged the scope of the invention in violation of the new matter prohibition of 35 USC §132. A comparison of the original application to the substitute specification shows that the substitute specification made a myriad of changes to the original application. See RPX-1A. Some of the changes remove the requirement that the processor elements must be identical. See Smith Tr. 1013:19-1019:23; 1063:15-1064:22; RPX-1A. To highlight the pertinent changes in the substitute specification, the following table compares the original application to the substitute specification. The language of

-57-

the original application is on the left and the corresponding language from the substitute specification on the right.

| Original Application | Substitute Application |
|---|---|
| Under SUMMARY OF THE INVENTION: "The present invention further executes the basic blocks containing the added intelligence on a system containing a plurality of identical processor elements each of which does not retain execution state information from prior operations"<br><br>JX-1 at 13:52-56 (orig. spec.) | Under SUMMARY OF THE INVENTION: "In another aspect, the present invention further executes the basic blocks containing the added intelligence on a system containing a plurality of processor elements each of which, in this particular embodiment, does not retain execution state information from prior operations."<br><br>JX-1 at 4:55-60 (sub. spec.) |
| Under BACKGROUND OF THE INVENTION: "The results of this static allocation are executed on a system containing a plurality of identical processor elements."<br><br>JX-1 at 4:12-14 (orig. spec.) | Under BACKGROUND OF THE INVENTION: "The results of this static allocation are executed on a system containing a plurality of processor elements.  In one embodiment of the invention, the processors are identical."<br><br>JX-1 at 4:20-23 (sub. spec.) |
| "All processor elements are identical"<br><br>JX-1 at 48:27 (orig. spec.) | "All processor elements 640 according to the illustrated embodiment are identical."<br><br>JX-1 at 43:18-20 (sub. spec.) |

As may be readily observed in the table above, the changes made by the substitute specification altered the substance and meaning of the inventors' original remarks. By removing the language that expressly required that all processor elements be identical and diluting the applicants' other express remarks by adding the "[i]n one embodiment" language, the applicants impermissibly tried to broaden the scope of the invention to include non-identical processor elements. Because the original application was found hereinabove to be limited to identical processor elements, the ALJ finds the

changes made by the substitute specification constitute "new matter" in violation of 35 USC § 132.[19]

Accordingly, the ALJ finds the asserted claims invalid.

### B.    Context Free Processor Elements

Respondents argue that the substitute specification impermissibly enlarged the scope of the disclosed invention from requiring context free processor elements to permitting both context free and non-context free processor elements. RPIB at 33-37; R2WIB at 18-20. Biax argues that the originally filed application discloses both context free and non-context free processor elements. CIB at 41-43. The Staff also argues that the originally filed application discloses both context free and non-context free processor elements. SIB at 43.

Each of the claims in the original application include a limitation directed to a plurality of processor elements. See JX-6 at JCFH0137-185. Biax and the Staff argue that the claims themselves provide proof that the originally filed application was not limited to context free

---

[19] The original application has been found herein to be limited to identical processor elements. Therefore, the asserted claims of the '945 patent are also so limited. See Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1333 (Fed. Cir. 2003) ("[P]rosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications."); see also Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."); Augustine Med., Inc. v. Gaymar Indus., Inc., 181 F.3d 1291, 1300 (Fed. Cir. 1999) ("The prosecution of a parent application may limit the scope of a later application using the same claim term."). The evidence of record shows that the accused TriMedia products do not use identical processors. See CDX-29; van de Waerdt Tr. 775:11-17; Hwu Tr. 944:20-945:3. Because the TriMedia products do not use identical processor elements and the asserted claims require identical processor elements, the TriMedia products do not infringe the asserted claims of the '945 patent. See Allen Eng'g Corp. v. Bartell Indus., 299 F.3d 1336, 1345 (Fed. Cir. 2002)("Literal infringement of a claim exists when each of the claim limitations 'reads on,' or in other words is found in, the accused device."); see also supra, § IV (finding the TriMedia also does not meet the logical processor number and instruction firing time limitations of the '945 patent).

processor elements. Specifically, Biax and the Staff argue that because dependent claims 58 and 66 explicitly add a limitation requiring the processor elements be "context free," under the doctrine of claim differentiation independent claims 53 and 60 would not be so limited.[20] The doctrine of claim differentiation is based on "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." Karlin Tech. Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971-72 (Fed. Cir. 1999). "To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant." Tandon Corp. v. U.S. Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987). According to the Staff, the difference between the dependant claims and independent claims is a strong indication that the original patent application disclosed processor elements that are non-context free. SRB at 6. In the absence of evidence to the contrary, the Staff's inference would be a plausible one. However, as discussed in detail below, there is powerful evidence to the contrary. In such cases, the Federal Circuit has held that "the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation." Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (citing Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1368 (Fed. Cir. 2000)); see also Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1480 (Fed. Cir. 1998) ("The doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence. . . . [C]laims that are written in different words may ultimately cover substantially the same subject matter.").

---

[20] Claim 58 depends from claim 53 and claim 66 depends from claim 60.

Because the claims do not stand alone, the specification is consulted to see if the applicant assigned a specific meaning to the term "processor elements" or whether the applicant explicitly disclaimed or otherwise limited the scope of the claims. Philips, 415 F.3d at 1316 ("our cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.)(internal citations omitted). The original specification contains numerous passages that are of import to the analysis herein. In the "BACKGROUND OF THE INVENTION," the applicant explicitly stated that the invention as a whole pertains to a system "containing a plurality of identical processor elements . . . characterized by the fact that they contain no execution state information from the execution of previous instructions, i.e., they are **context free**." JX-1 at 3:65-4:24 (orig. spec.)(emphasis added). In the same section of the specification, the applicant again states, in discussing the invention as a whole, that "[t]he processor elements of the present invention are **context free** processors that support a RISC-like instruction set. The term 'context free' means that the processor elements contain no state information, e.g., condition codes, registers, program status words, flags, etc." Id. at 7:30-40 (orig. spec)(emphasis added). Similarly, in the SUMMARY OF THE INVENTION, the applicant discloses that the "present invention further executes the basic blocks containing the added intelligence on a system containing a plurality of identical processor elements each of which does not retain execution state information from prior operations. Hence, all processor elements are **context free**." Id. at 13:52-57 (orig. spec.) (emphasis added).

-61-

In addition to the above statements describing aspects of the invention as a whole, in the section of the original application titled, GENERAL DESCRIPTION,[21] the applicants state that "[t]he TOLL software 110 performs these features by analyzing the instruction stream and then assigning **context free** processor elements and resources as a result thereof." Id. at 16:7-10 (orig. spec.) (emphasis added).  The applicants go on to explicitly note the importance of the context-free nature of the processor elements to the disclosed invention stating that "[t]he present invention can execute dependent instructions on different processor elements because of the **context free** nature of the processor elements." JX-1 at 18:2-7 (orig. spec.) (emphasis added).  In the same section of the original application, while describing the system architecture of the invention, the applicants also state that "[t]he logical resource drivers 620 are further interconnected to a plurality group of **context free** processor elements 640 over a network 650." Id. at 23:3-5 (orig. spec.)(emphasis added). Further, the applicants disclose that:

> The **context free** processor elements 640 are also unique to the TDA system architecture and will be discussed later. These processor elements display the context free stochastic property in which the future state of the system depends only on the present state of the system and not on the path by which the present state was achieved. As such, architecturally, the **context free** processor elements are uniquely different from conventional processor elements in two ways. First, the elements have no internal permanent storage or remnants of past events such as general purpose registers or program status words. Second, the elements do not perform any routing or synchronization functions. These tasks are performed by the software TOLL and are implemented in the LRDs. The significance of the architecture is that the **context free** processor elements of the present invention are a true shared resource to the LRDs.

Id. at 23:51-68 (orig. spec.)(emphasis added); see also id. at 24:9-20 (orig. spec.)("The general

---

[21]  In the introduction section of the GENERAL DESCRIPTION, the applicant states that "[i]n the following two sections, a general description of the software and hardware of the present invention takes place." JX-1 at 14:51-53 (orig. spec.).

operation of the present invention . . . is illustrated . . . in Figures 7a, 7b, and 7c. . . . Figure 7 generally represents the configuration of the **context free** processor elements PE0 through PE4."(emphasis added); <u>id.</u> at 25:29-35 (orig. spec.).

In each of the above cited passages the applicants explicitly state that the disclosed invention uses context-free processor elements. These statements are of particular import because in each instance the applicant is discussing the invention as a whole and not just a particular embodiment of the invention. Thus, these statements represent objective evidence that the inventors of the '945 patent believed their invention to be limited to context-free processor elements.

In the DETAILED DESCRIPTION section of the original application, the applicants teach that "[a]s shown in Figure 6, the TDA system 600 of the present invention is composed of memory 610, logical resource drives (LRD) 620, **context free** processor elements (PE) 640, and shared context storage files 660." JX-1 at 35:13-16 (orig. spec.)(emphasis added). The applicants also note in this section that in one embodiment of the invention directed to "a multiuser computer architecture capable of supporting several users simultaneously in both time and space," the "multiuser support is accomplished by the multiple LRDs, the use of **context free** processor elements, and the multiple context support present in the register and condition code files. <u>Id.</u> at 40:41-44 (orig. spec.)(emphasis added). Further, in discussing the embodiment of the invention illustrated in Figure 21, the applicants state that "each processor element 640 is **context-free** which differentiates it from conventional processor elements that require context information." <u>Id.</u> at 48:36-38 (orig. spec.)(emphasis added). In fact, the applicants state that "it is to be expressly understood, that any prior art type of processor element such as a micro-processor or other pipeline architecture could not be used under the teachings of the present invention, because such processors retain the state

-63-

information of the program they are processing" (i.e., are non-context free). <u>Id.</u> at 48:28-34 (orig. spec.). Although claim terms are not generally limited to preferred embodiments, the applicants consistent description of the processor elements as context free does lend additional support to Philips argument that the original application is limited to context free processor elements.

Contrary to the explicit statements made by the applicants throughout the original application indicating that the disclosed invention requires context free processor elements, Biax argues that the description of the embodiment of the invention illustrated in Figure 21 proves that the original application contemplated using non-context free processor elements. CIB at 41-42. Specifically, Biax argues that Figure 21 discloses an embodiment of the invention that uses pipelined processors with feedback paths. CIB at 41. Biax's expert, Dr. Stone, opines that the feedback path in the processor element allows the processor element to save a piece of data for use in the next instruction without returning the data to the shared register file. <u>Id.</u> Thus, according to Biax, the processor element retains some state information and is therefore non-context free. <u>Id.</u>

Biax's argument, however, fails to give appropriate consideration to the express language of the original application. In the original application the applicants explicitly state in describing the embodiment of Figure 21 that the processor elements are context free. <u>See</u> JX-1 at 48:36-38 (orig. spec.) ("each processor element 640 is **context-free** which differentiates it from conventional processor elements that require context information."); <u>see also id.</u> at 48:28-34 (orig. spec.)("it is to be expressly understood, that any prior art type of processor element such as a micro-processor or other pipeline architecture could not be used under the teachings of the present invention, because such processors retain the state information of the program they are processing."). Although Biax acknowledges that the applicants made such statements in the original application, Biax alleges that

the applicants' statements were an obvious error that was corrected by the substitute specification. CRB at 21-22. Contrary to Biax's allegation of error, in the substitute specification the applicants reiterated in describing the embodiment of Figure 21 that "it is to be expressly understood, that any prior art type of processor element such as a micro-processor or other pipeline architecture could not be used under the teachings of the present invention, because such processors retain substantial state information of the program they are processing." JX-1 at 43:20-25 (sub. spec.). Moreover, the applicants explicitly state in the substitute specification that "the additional data (chaining) paths do not change the fundamental context free nature of the processor elements of the present invention." Id. at 43:7-9 (sub. spec.). Further, in the SUMMARY OF THE INVENTION section of the substitute specification the applicants state that "[i]n another aspect of the invention, the context free processor is a pipelined processor element, in which each instruction requires several machine instruction clock cycles to complete." Thus, while Biax alleges that the statements in the original application were made in error, the applicants' express statements in the substitute specification indicate otherwise. These statements clearly indicate that the inventors considered pipelined processors with feedback paths to be context-free.

Having examined the specification, the prosecution history is consulted. Prior to examination of the '221 application (which matured into the '755 patent), the applicants filed a Petition under 37 C.F.R. 1.102(d) for Advancement of Examination ("Petition to Make Special"). See MPEP 708.02. In the Petition to Make Special, the applicants compared and contrasted the disclosed invention to numerous prior art references the applicants' discovered during a patentability search. See JX-6 at JCFH0444-466. In contrasting the prior art McDowell references and the disclosed invention, the applicants explicitly state that "[t]he processor elements of the present invention are context free

processors that support a RISC-like instruction set." JX-6 at JCFH04652. Additionally, the applicants state in the Petition to Make Special that "[t]he present invention further executes the basic blocks containing the added intelligence on a system using a plurality of identical processor elements **each of which is incapable of retaining execution information from prior operations**. Hence, all processor elements are **context free** . . ." Id. at JCFH0465 (emphasis added). Here again, the applicants explicitly state that the invention uses identical processor elements. Because the above statements make reference to the invention as a whole, those statements are strong objective evidence that the only thing the inventors had in their possession at the time of filing the original application was a system for parallel processing that used context free processor elements.

In addition to the intrinsic evidence of record, respondents rely on the testimony of the inventors of the '755 and '945 patents in support of their invalidity argument. RPRB at 17. The inventors' testimony provides additional context in which to resolve respondent's written description and new matter arguments. Inventors Brooks and Morrison testified that the original application described a system having only context-free processor elements. JX-27C (Brooks Depo.) at 320:2-303:7 (June 4, 2003); Morrison Tr. 142:18-145:8. In fact, Mr. Morrison testified that the use of context free processor elements was essential to the operation of the disclosed invention. Morrison Tr. 143:11-19. Additionally, in contrast to Biax's argument regarding the embodiment of the invention illustrated in Figure 21, inventor Brooks testified that the original application does not explicitly teach that the invention includes non-context free processor elements. See JX-27C (Brooks Depo.) at 302:2-303:7 (June 4, 2003).

In light of the originally filed claims and specification, the prosecution history of the original '221 application, the testimony of the inventors of the '755 and '945 patents, and the testimony of

the experts in this investigation, the ALJ finds the claimed processor elements in the original '221 application limited to context free processor elements. While the Staff's doctrine of equivalents argument suggests that the processor elements in claims 53 and 60 are not limited to being context free, the overwhelming evidence of record indicates that the applicants intended otherwise. <u>See</u> <u>Andersen Corp.</u>, 474 F.3d at 1369 ("the written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation."). There is absolutely no indication in the original specification or the prosecution history to suggest that the inventors ever contemplated using non-context free processor elements to execute the non-branch instructions. Far from it, the applicants' explicit statements in the specification and prosecution history make clear that the claimed processor elements were intended to be limited to context free processor elements. These clear and unequivocal statements represent objective evidence of the inventors' intent at the time the original application was filed and, in conjunction with the inventors' testimony and that of the experts in this investigation, prove clearly and convincingly that the inventors were not in possession at the time the original application was filed of a system for parallel processing that utilized non-context free processor elements to execute non-branch instructions. At the hearing respondents' expert, Dr. Smith, concurred. <u>See</u> Smith Tr. 1046:22-1047:3. Accordingly, to the extent Biax argues in this investigation that the plurality of processor elements in the asserted claims of the '945 patent may be non-context free, the ALJ finds such an interpretation to be in violation of the written description requirement of the 35 USC §112 ¶ 1.

Having determined that the original application is limited to identical processor elements, the substitute specification must be examined to determine whether the substitute specification impermissibly enlarged the scope of the invention in violation of the new matter prohibition of 35

USC §132.  A comparison of the original application to the substitute specification shows that the substitute specification made a myriad of changes to the original application.  See RPX-1A.  Some of the changes remove the requirement that the processor elements must be context free.  To highlight the pertinent changes in the substitute specification, the following table compares the original application to the substitute specification.  The language of the original application is on the left with the corresponding language from the substitute specification on the right.

| Original Application | Substitute Application |
|---|---|
| Under BACKGROUND OF THE INVENTION: "containing a plurality of identical processor elements . . . characterized by the fact that they contain no execution state information from the execution of previous instructions, i.e., they are context free."  JX-1 at 3:65-4:24 (orig. spec.) | Under BACKGROUND OF THE INVENTION: "containing a plurality of processor elements. . . The processor elements, in this illustrated embodiment, contain no execution state information from the execution of previous instructions, that is, they are context free."  JX-1 at 4:20-26 (sub. spec.) |
| Under BACKGROUND OF THE INVENTION: "[t]he processor elements of the present invention are context free processors that support a RISC-like instruction set.  The term 'context free' means that the processor elements contain no state information, e.g., condition codes, registers, program status words, flags, etc."  JX-1 at 7:30-40 (orig. spec) | The applicants deleted this passage in the substitute specification. |

| | |
|---|---|
| Under SUMMARY OF THE INVENTION: "present invention further executes the basic blocks containing the added intelligence on a system containing a plurality of identical processor elements each of which does not retain execution state information from prior operations. Hence, all processor elements are context free."<br><br>JX-1 at 13:52-57 (orig. spec.) | Under SUMMARY OF THE INVENTION: "In another aspect, the present invention further executes the basic blocks containing the added intelligence on a system containing a plurality of identical processor elements each of which, in this particular embodiment, does not retain execution state information from prior operations. Hence, all processor elements in accordance with this embodiment are context free."<br><br>JX-1 at 13:55-61 (sub. spec.) |
| Under GENERAL DESCRIPTION: "The TOLL software 110 performs these features by analyzing the instruction stream and then assigning context free processor elements and resources as a result thereof."<br><br>JX-1 at 16:7-10 (orig. spec.) | Under GENERAL DESCRIPTION: "The TOLL software 110 performs these features by analyzing the instruction stream and then assigning processor elements and resources as a result thereof. In one particular embodiment, the processors are context free."<br><br>JX-1 at 7:61-65 (sub. spec.) |
| Under GENERAL DESCRIPTION: "The present invention can execute dependent instructions on different processor elements because of the context free nature of the processor elements."<br><br>JX-1 at 18:2-7 (orig. spec.) | Under GENERAL DESCRIPTION: "The present invention can execute dependent instructions on different processor elements, in one illustrated embodiment, because of the context free nature of the processor elements."<br><br>JX-1 at 9:65-68 (sub. spec.) |
| Under GENERAL DESCRIPTION: "The logical resource drivers 620 are further interconnected to a plurality group of context free processor elements 640 over a network 650."<br><br>JX-1 at 23:3-5 (orig. spec.) | Under GENERAL DESCRIPTION: "The logical resource drivers 620 are further interconnected to a plurality of processor elements 640 over a network 650."<br><br>JX-1 at 15:14-17.(sub. spec.) |

| Under GENERAL DESCRIPTION: | Under GENERAL DESCRIPTION: |
|---|---|
| "The context free processor elements 640 are also unique to the TDA system architecture and will be discussed later.  These processor elements display the context free stochastic property in which the future state of the system depends only on the present state of the system and not on the path by which the present state was achieved.  As such, architecturally, the context free processor elements are uniquely different from conventional processor elements in two ways.  First, the elements have no internal permanent storage or remnants of past events such as general purpose registers or program status words.  Second, the elements do not perform any routing or synchronization functions.  These tasks are performed by the software TOLL and are implemented in the LRDs.  The significance of the architecture is that the context free processor elements of the present invention are a true shared resource to the LRDs." | "The processor elements 640 are also unique to the TDA system architecture and will be discussed later.  These processor elements in one particular aspect of the invention display a context free stochastic property in which the future state of the system depends only on the present state of the system and not on the path by which the present state was achieved.  As such, architecturally, the context free processor elements are uniquely different from conventional processor elements in two ways.  First, the elements have no internal permanent storage or remnants of past events such as general purpose registers or program status words.  Second, the elements do not perform any routing or synchronization functions.  These tasks are performed by the software TOLL and are implemented in the LRDs.  The significance of the architecture is that the context free processor elements of the present invention are a true shared resource to the LRDs.  In another preferred particular embodiment of the invention wherein pipelined processor elements are employed, the processors are not strictly context free as was described previously." |
| JX-1 at 23:51-68 (orig. spec.) | JX-1 at 15:65-16:17 (sub. spec.) |

As may be readily observed in the table above, the changes made by the substitute specification altered the substance and meaning of the inventors' original remarks.  By removing the language that expressly required that all processor elements be context free and diluting the applicants' other express remarks by adding language indicating that the statements only applied to specific embodiments of the invention, the applicants impermissibly tried to broaden the scope of the invention to include non-context free processor elements.  Because the original application was

-70-

found hereinabove to be limited to context free processor elements, the ALJ finds the changes made by the substitute specification constitute "new matter" in violation of 35 USC § 132.[22]  Accordingly, the ALJ finds the asserted claims of the '945 patent invalid.

### C.    Instruction Firing Time and Logical Processor Number

Philips argues that the substitute specification impermissibly altered the scope of the disclosed invention by removing the requirement that the added intelligence comprise both an instruction firing time and logical processor number. RPIB at 37-38.  Biax argues that it is clear from the original application that the added intelligence is not limited to both an instruction firing time and logical processor number.  CIB at 44.  Like Biax, the Staff also argues that Philips' "new matter" argument should be rejected.  SRB at 8.

"New matter" is determined on a claim by claim basis.  See Kolmes v. World Fibers Corp., 107 F.3d 1534, 1539 (Fed. Cir. 1997)("Claims to subject matter disclosed in the patent are not new matter.").  The same holds true for the written description requirement.  Vas-Cath, Inc. v. Mahurkar,

---

[22]  The original application has been found herein to be limited to context free processor elements.  Therefore, the asserted claims of the '945 patent are also so limited.  See Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1333 (Fed. Cir. 2003) ("[P]rosecution disclaimer may arise from disavowals made during the prosecution of ancestor patent applications."); see also Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."); Augustine Med., Inc. v. Gaymar Indus., Inc., 181 F.3d 1291, 1300 (Fed. Cir. 1999) ("The prosecution of a parent application may limit the scope of a later application using the same claim term.").  The evidence of record shows that the accused TriMedia products are not context free.  See Stone Tr. 1106:21-23.  Because the TriMedia products do not use context free processor elements and the asserted claims require context free processor elements, the TriMedia products do not infringe the asserted claims of the '945 patent.  See Allen Eng'g Corp. v. Bartell Indus., 299 F.3d 1336, 1345 (Fed. Cir. 2002)("Literal infringement of a claim exists when each of the claim limitations 'reads on,' or in other words is found in, the accused device."); see also supra, § IV (finding the TriMedia also does not meet the logical processor number and instruction firing time limitations of the '945 patent).

935 F.2d 1555, 1567 ("On remand, the district court should *separately* analyze whether the 'written description' requirement has been met as to the subject matter of *each* claim of the '141 and '329 patents.")(emphasis in original). Because the asserted claims of the '945 patent do, in fact, require both an IFT and LPN as part of the intelligence, the ALJ finds it unnecessary to consider Philips' argument that the asserted claims should be held invalid because the substitute specification allegedly removed the requirement that the added intelligence comprise both an instruction firing time and logical processor number.

## VI.    UNENFORCEABILITY - Inequitable Conduct

To hold a patent unenforceable due to inequitable conduct, there must be clear and convincing evidence that the applicant: (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information; and (2) intended to deceive the U.S. Patent and Trademark Office. Impax Labs., Inc. v. Aventis Pharms. Inc., 468 F.3d 1366, 1374 (Fed. Cir. 2006). Once a threshold level of both materiality and intent to deceive has been found, the materiality and intent to deceive must then be balanced to determine if equity should render the patent unenforceable. See Monsanto Co. v. Bayer Bioscience N.V., 363 F.3d 1235, 1239 (Fed. Cir. 2004); LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n, 958 F.2d 1066, 1070 (Fed. Cir. 1992). "The more material the conduct, the less evidence of intent will be required in order to find that inequitable conduct has occurred." PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1319 (Fed. Cir. 2000).

In the present investigation, Philips alleges[23] that the patent attorney charged with the prosecution of the '755 and '945 patents, Dr. Walpert, made affirmative misrepresentations to the USPTO during the prosecution of the patents with intent to deceive.[24] RPIB at 39. Specifically, Philips argues that Dr. Walpert made affirmative misrepresentations to the PTO examiner regarding the nature and scope of the changes made by the substitute specification filed during prosecution of each of the '755 and '945 patents. See id.; see also JX-7 at JCFH955-1044; JX-6 at JCFH0581-670, 683, 692. Philips argues that the misrepresentations were material and made with intent to deceive and that on balance, the evidence establishes inequitable conduct. Id. at 39, 43-47. Biax and the Staff both argue against a finding of inequitable conduct. CIB at 44-49; SIB at 37-41. Biax argues that Philips has failed to meet its burden of proof regarding both materiality and intent to deceive, while the Staff appears to confine its argument to Philips' alleged failure to show an intent to deceive. Id. As discussed in detail below, the Administrative Law Judge finds inequitable conduct in Dr. Walpert's affirmative misrepresentations to the patent examiner during the prosecution of the '755 and '945 patents.

## A.    Materiality

Materiality "embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." Bristol-Meyers Squibb Co. v. Phone-Poulenc Rorer, Inc., 326 F.3d 1226, 1234 (Fed. Cir. 2003); see Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1364 (Fed. Cir. 2007)("The materiality element

---

[23] Respondent 2-Wire does not set forth an inequitable conduct argument in its post-hearing briefs.

[24] Dr. Walpert took over prosecution of the '755 patent from attorney Robert Dorr in 1986. See RX-635C at BXITC0626010; Walpert Tr. 239:15-17.

of inequitable conduct was recently clarified in *Digital Control, Inc. v. Charles Machine Works*, 437 F.3d 1309 ("Fed. Cir. 2006). In that decision, we explained that the standard for materiality set forth in the current version of PTO Rule 56, *see* 37 C.F.R. § 1.56(b)(2006), did not supplant the earlier 'reasonable examiner' standard."). Philips argues that Dr. Walpert's affirmative misrepresentations to the examiner regarding the nature and scope of the changes made by the substitute specification are material. RPIB at 39, 423-44. Specifically, Philips argues that Dr. Walpert's misrepresentations that the substitute specification contained no new matter were material because there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the applications to issue as patents. Id. at 43.

Contemporaneous with the filing of the substitute specification during prosecution of the '755 patent, Dr. Walpert stated in his response to the examiner's first office action that:

> I am further enclosing herewith a request for amendment of the specification using a substitute specification. The application has been reviewed in great detail, in part in connection with a foreign filing effort; and as a result, numerous typographical errors have been found and corrected. In addition, the description of the prior art herein has been deleted since it appears in similar form in applicants' petition and is in any case of record in connection with the application. It is not considered necessary to add these twenty or more pages of text to the application itself. Furthermore, certain obvious errors, which are clear from a reading and understanding of the application as filled, have been corrected to avoid the necessity of a later reader having to perform the same ordinary corrective functions and to provide thereby a clearer and more accurate description of the invention. **No new matter has been added.**

JX-6 at JCFH0580-81 (emphasis added). Dr. Walpert also filed a signed declaration pursuant to 37 C.F.R. §1.125 stating that "[i]n my opinion, no new matter has been added to the application by the filing of or in the substitute specification." Id. at JCFH0683. Additionally, Dr. Walpert stated in his response to the examiner's second office action that:

[i]nasmuch as all of my understanding of the details of the disclosed invention at that time came from the application itself, my rearrangement and revisions of the application could not then constitute "new matter" since, not being an inventor and not working in the computer field as an engineer or scientist, my own understanding (in addition to that which was generally known in the art), came solely from the application as filed. . . . Based upon the above, it is my understanding that no new matter has been added to the application.

Id. at JCFH0691-692.

Dr. Walpert's statements to the examiner that the substitute specification contained no new matter were affirmative misrepresentations because the substitute specification impermissibly broadened the scope of the originally-filed patent application in violation of the prohibition against new matter. See supra, at § V. The Administrative Law Judge finds Dr. Walpert's failure to inform the examiner that he had removed certain statements, and modified others in the originally filed specification that had explicitly limited the claims to identical, context-free processor elements material. See Hoffman-La Roche, Inc. v. Promega Corp., 323 F.3d 1354 (Fed. Cir. 2003) ("[A]ffirmative misrepresentations by the patentee, in contrast to misleading omissions, are more likely to be regarded as material")(quoting Rohm & Haas Co. v. Crystal Chem. o., 722 F.2d 1556, 1571 (Fed. Cir. 1983)). A reasonable examiner would have found such information important as it goes straight to the heart of whether the substitute specification violated the statutory prohibition against new matter. In fact, if there was any doubt whether such information would have been of import to a reasonable examiner, the PTO examiner examining the '755 patent application specifically stated in the second office action that "[c]laims 1-6, 8, 10, 11, 14-17, 22-24, 24 [sic], 25, 26, 36-39, 60-68, and 76 are patentable over the art of record and would be allowable it [sic] the substitute specification contains no new matter." JX-6 at JCFH0682. Furthermore, the information would have been important to a reasonable examiner because it informs the examiner about the

-75-

proper scope of the claims and consequently the proper universe of potentially invalidating prior art.

**B.      Intent to Deceive**

To find an intent to deceive, Philips must show that the involved conduct, viewed in light of all the evidence, including evidence of good faith, indicates sufficient culpability. Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 876 (Fed. Cir. 1988). There is no requirement that intent to deceive be proven by direct evidence. Instead, intent to deceive may be "inferred from the facts and circumstances surrounding the applicant's overall conduct." Impax Labs, 468 F.3d at 1375. To prove intent to deceive, Philips relies on various communications leading up to the filing of the substitute specification and Dr. Walpert's own actions and statements in connection with the filing of the substitute specification. See RPIB at 41-47.

The original U.S. patent application serial no. 794,221 ("the '221 application") was written and filed by patent attorney Robert Dorr.[25]   JX-6 at JCFH0008.   After the filing of the original application, Dr. Walpert was retained to handle the remaining prosecution of the '755 patent. Walpert Tr. 239:15-17. At the request of Mr. Frederick Gluck, one of the inventors of the '755 and '945 patents, Dr. Walpert undertook a study of "the [original] patent application, the petitions prepared by Bob Dorr, the art cited in the petitions, and various MCC summary documents."[26] RX-635C at BIA1054391. Thereafter, Dr. Walpert wrote a 13-page report to Mr. Gluck summarizing his conclusions, detailing the basis of his views, and providing a checklist of recommendations. Id.

---

[25]  The '221 application eventually matured into the '755 patent. See JX-4.

[26]  "MCC" refers to Morrison Computer Corporation. RX-635C. The Morrison Computer Corporation eventually reorganized into BIAX Corporation. Livingstone Tr. 194.

In the report, Dr. Walpert discusses the petition to advance prosecution of the '221 application that was filed by attorney Robert Dorr. See id. at BIA1054393-94; see also JX-6 at JCFH0444-466. In discussing the petition to advance prosecution, Dr. Walpert acknowledges that the petition contains explicit statements "relating to, for example, 'the invention' including means for adding logical processor numbers and instruction firing times to each instruction, or having a plurality of identical and context free processors." RX-635C at BIA105394. According to Dr. Walpert, "[t]hese statements, under a so-called file wrapper estoppel argument, could unduly limit the scope of the claims. Thus these limitations could be read into a claim even if the claim did not explicitly include them." Id.

In addition to noting the limiting statements in the petition to advance prosecution, Dr. Walpert notes in his report that the originally-filed application also contains statements that may limit the claims. For example, Dr. Walpert states that:

> The basis for concluding that the claims presently on file could be unduly limited are statements which have been made in the application as well as the petition which was filed before and rejected by the Patent and Trademark Office. For example, the application when it refers to "the patent invention" states "[t]he added intelligence includes a logical processor number and an instruction firing time . . . The results of this static allocation are executed on a system containing a plurality of identical processor elements. These processor elements are characterized by the fact that they contain no execution state information from the execution of previous instructions, i.e., they are context free." (application page 7, lines 19-21 and 27-33). . . . Then, further, "The processor elements of the present invention are context free processors that support a RISC-like instruction set. The term 'context free' means that the processor elements contain no state information . . ." (application page 14, lines 20-24). And, in the Summary of the Invention, "The present invention . . . further executes the basic blocks containing the added intelligence on a system containing a plurality of identical processor elements, each of which does not retain execution state information from prior operations. Hence all processor elements are context free." (application, page 28, lines 8-13 and 20-25).

Id. at BIA1054396. In addition to the above examples, Dr. Walpert explicitly acknowledges that

-77-

"[o]ne can cite many more examples in the application and the petition which state unequivocally that the invention requires . . . processors which are context free." Id. at BIA1054397. According to Dr. Walpert,

> a Court could reasonably interpret each claim as including, implicitly or explicitly, a hardware structure which includes only context free processor elements. (I understand that there are a number of claims, for example claim 18, which do not specify the processor hardware at all. These claims, however, could still be limited, by a Court, to an application which uses, for example, context free processors.).

Id. at BIA1054396. Thus, Dr. Walpert recommends in the report "rewording those portions of the application which may tend to unduly limit the claims, for example, when it is said that all processor elements are context free." Id. at BIA1054394.

Approximately a month and half after Dr. Walpert sent his report to Mr. Gluck, Dr. Walpert sent Mr. Gluck a draft of the revised patent application, which appears to have done just what Dr. Walpert recommended, "rewording . . . the application" in an attempt to prevent it from limiting the scope of the claims. See RX-627C. Dr. Walpert stated in the letter accompanying the draft that:

> [t]he description has been edited, in major respects, to remove the requirement of context free and/or identical processors, to better recognize the applicability to pipelined processing, to remove the lengthy description of the prior art, and to better clarify the description (in particular, the operation of the hardware) and the claims.

Id. Three days later, Mr. Gluck provided Dr. Walpert with various edits, granting Dr. Walpert "artistic license to include or exclude as much as you want," but noting that "the primary focus of all this is to qualify the use of context-free PE's." RX-628C.

On August 27, 1987, the USPTO issued a first office action for the '221 application. See JX-6 at JCFH0501-503. On June 13, 1988, Dr. Walpert filed a response to the first office action, which included a request to file the substitute specification. JX-6 at JCFH0580-581. Specifically, Dr.

Walpert stated:

> I am further enclosing herewith a request for amendment of the specification using a substitute specification. The application has been reviewed in great detail, in part in connection with a foreign filing effort; and as a result, numerous typographical errors have been found and corrected. In addition, the description of the prior art herein has been deleted since it appears in similar form in applicants' petition and is in any case of record in connection with the application. It is not considered necessary to add these twenty or more pages of text to the application itself. Furthermore, certain obvious errors, which are clear from a reading and understanding of the application as filled, have been corrected to avoid the necessity of a later reader having to perform the same ordinary corrective functions and to provide thereby a clearer and more accurate description of the invention. No new matter has been added.

JX-6 at JCFH0580-81.

Thereafter, on September 22, 1988, the USPTO issued a second office action for the '221 application. See JX-6 at JCFH0679-682. In the second office action, the patent examiner noted that the applicants had failed to file along with the substitute specification a declaration as required by 37 C.F.R. §1.125. Id. at JCFH0680. The patent examiner also stated that the "[a]pplicants in their next response should comment why the extensive revision in certain areas of the specification do not constitute new matters." Id. Additionally, the examiner stated that "[c]laims 1-6, 8, 10, 11, 14-17, 22-24, 24 [sic], 25, 26, 36-39, 60-68, and 76 are patentable over the prior art of record and would be allowable it [sic] the substitute specification contains no new matter." Id. at JCFH0682.

In response to the second office action, Dr. Walpert filed a signed declaration under 37 C.F.R. §1.125 in which he attested that in his opinion, "no new matter has been added to the application by the filing of or in the substitute specification." JX-6 at JCFH0683; see Refac Int'l, Inc. v. Lotus Development Corp., 81 F.3d 1576, 1583 (Fed. Cir. 1996) ("[O]ne cannot excuse the submission of a misleading affidavit on the ground that it was only cumulative. Affidavits are

inherently material, even if only cumulative. The affirmative act of submitting an affidavit must be construed as being intended to be relied upon."). Additionally, Dr. Walpert stated in his response to the second office action that:

> [i]nasmuch as all of my understanding of the details of the disclosed invention at that time came from the application itself, my rearrangement and revisions of the application could not then constitute "new matter" since, not being an inventor and not working in the computer field as an engineer or scientist, my own understanding (in addition to that which was generally known in the art), came solely from the application as filed. . . . Based upon the above, it is my understanding that no new matter has been added to the application. . . . Nevertheless, if there is particular text with which the Examiner is concerned, I am more than willing to make the necessary comparisons.

Id. at JCFH0691-692. On February 2, 1989, a Notice of Allowability was mailed allowing claims 1-7, 20-22, 26, 36-39, 60-68 and 75-77, and canceling claim 74. Id. at JCFH0702-704. On July 11, 1989 the '755 patent issued. See JX-4.

There can be no question that the communications between Dr. Walpert and Mr. Gluck illustrate that Dr. Walpert was well aware that the originally filed '221 application contained numerous limiting statements indicating that the disclosed invention used context free processor elements. The same correspondence also shows that Dr. Walpert knew that a court might find the claims of the '221 application constrained by those express limiting statements. Thus, the evidence shows, Dr. Walpert set out to draft a substitute specification that, inter alia, would reword those portions of the application so that the statements would not limit the invention to context free processor elements.

Although the evidence clearly illustrates that Dr. Walpert was well aware of the significance of the limiting statements in the originally filed application and the potential for enforcement of those limiting statements through the legal doctrines of prosecution history estoppel and disclaimer,

-80-

Dr. Walpert nevertheless filed the substitute specification without bringing any of the substantive changes to the examiner's attention. In fact, in contrast with Dr. Walpert's statement to Mr. Gluck that the "description has been edited, in major respects, to remove the requirement of context free and/or identical processors, to better recognize the applicability to pipelined processing, to remove the lengthy description of the prior art, and to better clarify the description (in particular, the operation of the hardware) and the claims," Dr. Walpert only informed the examiner that the substitute specification corrected numerous typographical errors, removed the description of the prior art, and corrected certain obvious errors.

Apparently not entirely satisfied by Dr. Walpert's explanation regarding the changes made to the substitute specification, the patent examiner told the applicants to comment in their next response why the extensive revisions to the specification do not constitute new matter. The evidence will not support a claim that Dr. Walpert misunderstood the examiner's request.[27] And yet, the evidence shows Dr. Walpert never provided the examiner with such an explanation. Instead, the evidence shows that Dr. Walpert attempted to placate the examiner by stating in his response to the second office action that "if there is particular text with which the Examiner is concerned, I am more than willing to make the necessary comparisons."

Dr. Walpert also tried to quell the examiner's new matter concerns by stating that the revisions made in the substitute specification could not constitute new matter, because all of his

---

[27] After receiving the second office action, Dr. Walpert wrote the then President of Biax, Mr. Raymond Livingstone. See RX-629C. In his letter to Mr. Livingstone, Dr. Walpert noted that the patent examiner "is **requiring** that we explain why, in filing the substitute specification, no new matter has been added to the application." Id. at BXITC0625889 (emphasis added). Dr. Walpert suggested that he and Mr. Livingstone "should discuss the best way of meeting the Examiner's request for a "road map" through the substitute specification regarding new matter." Id.

-81-

understanding of the invention came solely from the application as filed and because he was not an inventor and not working in the computer field as an engineer or scientist. Contrary to Dr. Walpert's statement, the evidence of record clearly shows that Dr. Walpert's understanding of the invention did not come solely from the application as filed (and that which was generally known in the art), but also from his communications and conversations with Mr. Gluck and "various MCC summary documents." Furthermore, while Dr. Walpert's statement to the examiner that he was not an inventor or someone working in the computer field as an engineer or scientist may have been true on its face, it was nevertheless misleading as the evidence shows Dr. Walpert holds three electrical engineering degrees from MIT and is considered as someone "above" one of ordinary skill in the art.[28] Walpert Tr. 289:16-21, 370:8-12.

The substitute specification contained a voluminous number of changes. See RPX-1. Buried among the changes were a handful of substantive changes that either deleted or modified explicit statements that a reasonable examiner would certainly have considered material in deciding the patentability of the '221 application. Dr. Walpert never pointed the examiner to those changes, even though he knew the statements could be considered by a court to limit the scope of the claims. Based on the evidence of record, it appears that Dr. Walpert's actions and statements were planned and calculated to persuade the examiner that the changes made by the substitute specification were minor and that no new matter was added. Based on the above evidence, the Administrative Law Judge concludes that Dr. Walpert's conduct leading up to, and in connection with, the filing of the substitute specification during prosecution of the '755 patent indicates sufficient culpability to

---

[28] Complainant's expert, Dr. Stone, testified that Dr. Walpert is someone above one of ordinary skill in the art. Stone Tr. 572:7-22.

constitute an intent to deceive.

### C.    Conclusion

Having found clear and convincing evidence of materiality and an intent to deceive, the materiality and intent to deceive must be balanced to determine if equity should render the patent unenforceable. Dr. Walpert's affirmative misrepresentations to the examiner that the substitute specification contained no new matter when in fact Dr. Walpert knowingly included several substantive changes in the substitute specification that enlarged the scope of the claims were highly material. Buried among a mountain of changes in the substitute specification, Dr. Walpert deleted various limiting statements that unequivocally indicated that the invention as originally filed only used identical context free processor elements and modified other statements to indicate that what was once required was now but a mere embodiment of the invention. Further, the manner in which Dr. Walpert assured and reassured the examiner that no new matter was included while simultaneously side-stepping the examiner's request for an explanation of why the extensive revisions do not constitute new matter shows a significant intent to deceive. The more material the conduct, the less evidence of intent will be required in order to find that inequitable conduct has occurred. PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1319 (Fed. Cir. 2000). For the reasons stated hereinabove, the Administrative Law Judge finds that Dr. Walpert engaged in inequitable conduct and that equity requires that the'755 and '945 patents be rendered unenforceable.

-83-

## CONCLUSIONS OF LAW

1.   The Commission has personal jurisdiction over the parties, and subject matter jurisdiction over this investigation.

2.   The accused products in this investigation do not infringe claims 6, 9-11, and 36 of the '945 patent.

3.   Claims 6, 9-11 and 36 of the '945 patent are invalid for lack of written description under 35 U.S.C. § 112 and/or for violating the new matter prohibition set forth in 35 U.S.C. §132(a).

4.   The '755 patent is unenforceable due to inequitable conduct.

5.   The '945 patent is unenforceable due to inequitable conduct.

6.   Biax has satisfied the domestic industry requirement with respect to the '945 patent.