# EXHIBIT 1

**PART 6**

US 6,253,313 B1

25                                                                                              26

n could equal 31 for a total of 32 registers. Likewise, the L could equal 15 for a total of 16 levels. Note that these registers are not shared between levels; that is, each level has a set of registers which is physically distinct from the registers of each other level.

Each level of registers corresponds to that group of registers available to a subroutine executing at a particular depth relative to the main program. For example, the set of registers at level zero can be available to the main program; the set of registers at level one can be available to a first level subroutine that is called directly from the main program; the set of registers at level two can be available to any subroutine (a second level subroutine) called directly by a first level subroutine; the set of registers at level three can be available to any subroutine called directly by a second level subroutine; and so on.

As these sets of registers are independent, the maximum number of levels corresponds to the number of subroutines that can be nested before having to physically share any registers between subroutines, that is, before having to store the contents of any registers in main memory. The register sets, in their different levels, constitute a shared resource of the present invention and significantly saves system overhead during subroutine calls since only rarely do sets of registers need to be stored, for example in a stack, in memory.

Communication between different levels of subroutines takes place, in the preferred illustrated embodiment, by allowing each subroutine up to three possible levels from which to obtain a register: the current level, the previous (calling) level (if any) and the global (main program) level. The designation of which level of registers is to be accessed, that is, the level relative to the presently executing main program or subroutine, uses the static SCSM information attached to the instruction by the TOLL software. This information designates a level relative to the instruction to be processed. This can be illustrated by a subroutine call for a SINE function that takes as its argument a value representing an angular measure and returns the trigonometric SINE of that measure. The main program is set forth in Table 12; and the subroutine is set forth in Table 13.

TABLE 12

| Main Program | Purpose |
|---|---|
| LOAD X, R1 | Load X from memory into Reg R1 for parameter passing |
| CALL SINE | Subroutine Call - Returns result in Reg R2 |
| LOAD R2, R3 | Temporarily save results in Reg R3 |
| LOAD Y, R1 | Load Y from memory into Reg R1 for parameter passing |
| CALL SINE | Subroutine Call - Returns result in Reg R2 |
| MULT R2, R3, R4 | Multiply Sin (x) with Sin (y) and store result in Reg R4 |
| STORE R4, Z | Store final result in memory at Z |

The SINE subroutine is set forth in Table 13:

TABLE 13

| Instruction | Subroutine | Purpose |
|---|---|---|
| I0 | Load R1 (L0), R2 | Load Reg R2, level 1 with contents of Reg R1, level 0 |
| Ip-1 | (Perform SINE), R7 | Calculate SINE function and store result in Reg R7, level 1 |
| Ip | Load R7, R2 (L0) | Load Reg R2, level 0 with contents of Reg R7, level 1 |

Hence, under the teachings of the present invention and with reference to FIG. 14, instruction I0 of the subroutine loads register R2 of the current level (the subroutine's level or called level) with the contents of register R1 from the previous level (the calling routine or level). Note that the subroutine has a full set of registers with which to perform the processing independent of the register set of the calling routine. Upon completion of the subroutine call, instruction Ip causes register R7 of the current level to be stored in register R2 of the calling routine's level (which returns the results of the SINE routine back to the calling program's register set).

As described in more detail in connection with FIG. 22, the transfer between the levels occurs through the use of the SCSM dynamically generated information which can contain the absolute value of the current procedural level of the instruction (that is, the level of the called routine), the previous procedural level (that is, the level of the calling routine) and the context identifier. The absolute dynamic SCSM level information is generated by the LRD from the relative (static) SCSM information provided by the TOLL software. The context identifier is only used when processing a number of programs in a multi-user system. The relative SCSM information is shown in Table 13 for register R1 (of the calling routine) as R1(L0) and for register R2 as R2(L0). All registers of the current level have appended an implied (00) signifying the current procedural level.

This method and structure described in connection with FIGS. 13 and 14 differ substantially from prior art approaches where physical sharing of the same registers occurs between registers of a subroutine and its calling routine. By thereby limiting the number of registers that are available for use by the subroutine, more system overhead for storing the registers in main memory is required. See, for example, the MIPS approach as set forth in "Reduced Instruction Set Computers" David A. Patterson, Communications of the ACM, January, 1985, Vol. 28, No. 1, Pgs. 8–21) In that reference, the first sixteen registers are local registers to be used solely by the subroutine, the next eight registers, registers 16 through 23, are shared between the calling routine and the subroutine, and final eight registers, registers 24 through 31 are shared between the global (or main) program and the subroutine. Clearly, out of 32 registers that are accessible by the subroutine, only 16 are dedicated solely for use by the subroutine in the processing of its program. In the processing of complex subroutines, the limited number of registers that are dedicated solely to the subroutine may not (in general) be sufficient for the processing of the subroutine. Data shuffling (entailing the storing of intermediate data in memory) must then occur, resulting in significant overhead in the processing of the routine.

US 6,253,313 B1

27                                                          28

Under the teachings of the present invention, the relative transfers between the levels which are known to occur at compile time are specified by adding the requisite information to the register identifiers as shown in FIG. 4 (the SCSM data), to appropriately map the instructions between the various levels. Hence, a completely independent set of registers is available to the calling routine and to each level of subroutine. The calling routine, in addition to accessing its own complete set of registers, can also gain direct access to a higher set of registers using the aforesaid static SCSM mapping code which is added to the instruction, as previously described. There is literally no reduction in the size of the register set available to a subroutine as specifically found in prior art approaches. Furthermore, the mapping code for the SCSM information can be a field of sufficient length to access any number of desired levels. For example, in one illustrated embodiment, a calling routine can access up to seven higher levels in addition to its own registers with a field of three bits. The present invention is not to be limited to any particular number of levels nor to any particular number of registers within a level. Under the teachings of the present invention, the mapping shown in FIG. 14 is a logical mapping and not a conventional physical mapping. For example, three levels, such as the calling routine level, the called level, and the global level require three bit maps. The relative identification of the levels can be specified by a two bit word in the static SCSM, for example, the calling routine by (00), the subordinate level by (01), and the global level by (11). Thus, each user's program is analyzed and the static SCSM relative procedural level information, also designated a window code, is added to the instructions prior to the issuance of the user program to a specific LRD. Once the user is assigned to a specific LRD, the static SCSM level informatin is used to generate the LRD dependent and dynamic SCSM information which is added as it is needed.

2. Detailed Description of the Hardware

As shown in FIG. 6, the TDA system 600 of the present invention is composed of memory 610, logical resource drivers (LRD) 620, processor elements (PEs) 640, and shared context storage files 660. The following detailed description starts with the logical resource drivers since the TOLL software output is loaded into this hardware.

a. Logical Resource Drivers (LRDS)

The details of a particular logical resource driver (LRD) is set forth in FIG. 15. As shown in FIG. 6, each logical resource driver 620 is interconnected to the LRD-memory network 630 on one side and to the processor elements 640 through the PE-LRD network 650 on the other side. If the present invention were a SIMD machine, then only one LRD is provided and only one context file is provided. For MIMD capabilities, one LRD and one context file is provided for each user so that, in the embodiment illustrated in FIG. 6, up to "n" users can be accommodated.

The logical resource driver 620 is composed of a data cache section 1500 and an instruction selection section 1510. In the instruction selection section, the following components are interconnected. An instruction cache address translation unit (ATU) 1512 is interconnected to the LRD-memory network 630 over a bus 1514. The instruction cache ATU 1512 is further interconnected over a bus 1516 to an instruction cache control circuit 1518. The instruction cache control circuit 1518 is interconnected over lines 1520 to a series of cache partitions 1522a, 1522b, 1522c, and 1522d. Each of the cache partitions is respectively connected over busses 1524a, 1524b, 1524c, and 1524d to the LRD-memory network 630. Each cache partition circuit is further interconnected over lines 1536a, 1536b, 1536c, and

1536d to a processor instruction queue (PIQ) bus interface unit 1544. The PIQ bus interface unit 1544 is connected over lines 1546 to a branch execution unit (BEU) 1548 which in turn is connected over lines 1550 to the PE-context file network 670. The PIQ bus interface unit 1544 is further connected over lines 1552a, 1552b, 1552c, and 1552d to a processor instruction queue (PIQ) buffer unit 1560 which in turn is connected over lines 1562a, 1562b, 1562c, and 1562d to a processor instruction queue (PIQ) processor assignment circuit 1570. The PIQ processor assignment circuit 1570 is in turn connected over lines 1572a, 1572b, 1572c, and 1572d to the PE-LRD network 650 and hence to the processor elements 640.

On the data cache portion 1500, a data cache ATU 1580 is interconnected over bus 1582 to the LRD-memory network 630 and is further interconnected over bus 1584 to a data cache control circuit 1586 and over lines 1588 to a data cache interconnection network 1590. The data cache control 1586 is also interconnected to data cache partition circuits 1592a, 1592b, 1592c and 1592d over lines 1593. The data cache partition circuits, in turn, are interconnected over lines 1594a, 1594b, 1594c, and 1594d to the LRD-memory network 630. Furthermore, the data cache partition circuits 1592 are interconnected over lines 1596a, 1596b, 1596c, and 1596d to the data cache interconnection network 1590. Finally, the data cache interconnection network 1590 is interconnected over lines 1598a, 1598b, 1598c, and 1598d to the PE-LRD network 650 and hence to the processor elements 640.

In operation, each logical resource driver (LRD) 620 has two sections, the data cache portion 1500 and the instruction selection portion 1510. The data cache portion 1500 acts as a high speed data buffer between the processor elements 640 and memory 610. Note that due to the number of memory requests that must be satisfied per unit time, the data cache 1500 is interleaved. All data requests made to memory by a processor element 640 are issued on the data cache interconnection network 1590 and intercepted by the data cache 1592. The requests are routed to the appropriate data cache 1592 by the data cache interconnection network 1590 using the context identifier that is part of the dynamic SCSM information attached by the LRD to each instruction that is executed by the processors. The address of the desired datum determines in which cache partition the datum resides. If the requested datum is present (that is, a data cache hit occurs), the datum is sent back to the requesting processor element 640.

If the requested datum is not present in data cache, the address delivered to the cache 1592 is sent to the data cache ATU 1580 to be translated into a system address. The system address is then issued to memory. In response, a block of data from memory (a cache line or block) is delivered into the cache partition circuits 1592 under control of data cache control 1586. The requested data, that is resident in this cache block, is then sent through the data cache interconnection network 1590 to the requesting processor element 640. It is to be expressly understood that this is only one possible design. The data cache portion is of conventional design and many possible implementations are realizable to one skilled in the art. As the data cache is of standard functionality and design, it will not be discussed further.

The instruction selection portion 1510 of the LRD has three major functions; instruction caching, instruction queueing and branch execution. The system function of the instruction cache portion of selection portion 1510 is typical of any instruction caching mechanism. It acts as a high speed instruction buffer between the processors and memory.

US 6,253,313 B1

| 29 | 30 |

However, the current invention presents methods and an apparatus configuration for realizing this function that are unique.

One purpose of the instruction portion 1510 is to receive execution sets from memory, place the sets into the caches 1522 and furnish the instructions within the sets, on an as needed basis, to the processor elements 640. As the system contains multiple, generally independent, processor elements 640, requests to the instruction cache are for a group of concurrently executable instructions. Again, due to the number of requests that must be satisfied per unit time, the instruction cache is interleaved. The group size ranges from none to the number of processors available to the users. The groups are termed packets, although this does not necessarily imply that the instructions are stored in a contiguous manner. Instructions are fetched from the cache on the basis of their instruction firing time (IFT). The next instruction firing time register contains the firing time of the next packet of instructions to be fetched. This register may be loaded by the branch execution unit 1548 of the LRD as well as incremented by the cache control unit 1518 when an instruction fetch has been completed.

The next IFT register (NIFTR) is a storage register that is accessible from the context control unit 1518 and the branch execution unit 1548. Due to its simple functionality, it is not explicitly shown. Technically, it is a part of the instruction cache control unit 1518, and is further buried in the control unit 1660 (FIG. 16). The key point here is that the NIFTR is merely a storage register which can be incremented or loaded.

The instruction cache selection portion 1510 receives the instructions of an execution set from memory over bus 1524 and, in a round robin manner, places instructions word into each cache partitions, 1522a, 1522b, 1522c and 1522d. In other words, the instructions in the execution set are directed so that the first instruction is delivered to cache partition 1522a, the second instruction to cache partition 1522b, the third instruction to cache partition 1522c, and the fourth instruction to cache partition 1522d. The fifth instruction is then directed to cache partition 1522a, and so on until all of the instructions in the execution set are delivered into the cache partition circuits.

All the data delivered to the cache partitions are not necessarily stored in the cache. As will be discussed, the execution set header and trailer may not be stored. Each cache partition attaches a unique identifier (termed a tag) to all the information that is to be stored in that cache partition. The identifier is used to verify that information obtained from the cache is indeed the information desired.

When a packet of instructions is requested, each cache partition determines if the partition contains an instruction that is a member of the requested packet. If none of the partitions contain an instruction that is a member of the requested packet (that is, a miss occurs), the execution set that contains the requested packet is requested from memory in a manner analogous to a data cache miss.

If a hit occurs (that is, at least one of the partitions 1522 contains an instruction from the requested packet), the partition(s) attach any appropriate dynamic SCSM information to the instruction(s). The dynamic SCSM information, which can be attached to each instruction, is important for multi-user applications. The dynamically attached SCSM information identifies the context file (see FIG. 6) assigned to a given user. Hence, under the teachings of the present invention, the system 600 is capable of delay free switching among many user context files without requiring a master processor or access to memory.

The instruction(s) are then delivered to the PrQ bus interface unit 1544 of the LRD 620 where it is routed to the appropriate PIQ buffers 1560 according to the logical processor number (LPN) contained in the extended intelligence that the TOLL software, in the illustrated embodiment, has attached to the instruction. The instructions in the PIQ buffer unit 1560 are buffered for assignment to the actual processor elements 640. The processor assignment is performed by the PIQ processor assignment unit 1570. The assignment of the physical processor elements is performed on the basis of the number of processor elements currently available and the number of instructions that are available to be assigned. These numbers are dynamic. The selection process is set forth below.

The details of the instruction cache control 1518 and of each cache partition 1522 of FIG. 15 are set forth in FIG. 16. In each cache partition circuit 1522, five circuits are utilized. The first circuit is the header route circuit 1600 which routes an individual word in the header of the execution set over a path 1520b to the instruction cache context control unit 1660. The control of the header route circuit 1600 is effected over path 1520a by the header path select circuit 1602. The header path select circuit 1602 based upon the address received over lines 1520b from the control unit 1660 selectively activates the required number of header routers 1600 in the cache partitions. For example, if the execution set has two header words, only the first two header route circuits 1600 are activated by the header path select circuit 1602 and therefore two words of header information are delivered over bus 1520b to the control unit 1660 from the two activated header route circuits 1600 of cache partition circuits 1522a and 1522b (not shown). As mentioned, successive words in the execution set are delivered to successive cache partition circuits 1522.

For example, assume that the data of Table 1 represents an entire execution set and that appropriate header words appear at the beginning of the execution set. The instructions with the earliest instruction firing times (IFTs) are listed first and for a given IFT, those instructions with the lowest logical processor number are listed first. The table reads:

TABLE 14

| Header Word 1 |
| Header Word 2 |
| I0 (T16) (PE0) |
| I1 (T16) (PE1) |
| I4 (T16) (PE2) |
| I2 (T17) (PE0) |
| I5 (T17) (PE1) |
| I3 (T18) (PE0) |

Hence, the example of Table 1 (that is, the matrix multiply inner loop), now has associated with it two header words and the extended information defining the firing time (IFT) and the logical processor number (LPN). As shown in Table 14, the instructions were reordered by the TOLL software according to the firing times. Hence, as the execution set shown in Table 14 is delivered through the LRD-memory network 630 from memory, the first word (Header Word 1) is routed by partition CACHE0 to the control unit 1660. The second word (Header Word 2) is routed by partition CACHE1 (FIG. 15) to the control unit 1660. Instruction I0 is delivered to partition CACHE2, instruction I1 to partition CACHE3, instruction I2 to partition CACHE0, and so forth. As a result, the cache partitions 1522 now contain the instructions as shown in Table 15:

US 6,253,313 B1

**31**

TABLE 15

| Cache0 | Cache1 | Cache2 | Cache3 |
|--------|--------|--------|--------|
|        |        | I0     | I1     |
| I4     | I2     | I5     | I3     |

It is important to clarify that the above example has only one basic block in the execution set (that is, it is a simplistic example). In actuality, an execution set would have a number of basic blocks.

The instructions are then delivered for storage into a cache random access memory (RAM) 1610 resident in each cache partition. Each instruction is delivered from the header router 1600 over a bus 1602 to the tag attacher circuit 1604 and then over a line 1606 into the RAM 1610. The tag attacher circuit 1604 is under control of a tag generation circuit 1612 and is interconnected therewith over a line 1520c. Cache RAM 1610 could be a conventional cache high speed RAM as found in conventional superminicomputers.

The tag generation circuit 1612 provides a unique identification code (ID) for attachment to each instruction before storage of that instruction in the designated RAM 1610. The assigning of process identification tags to instructions stored in cache circuits is conventional and is done to prevent aliasing of the instructions. "Cache Memories" by Alan J. Smith, ACM Computing Surveys, Vol. 14, September, 1982. The tag comprises a sufficient amount of information to uniquely identify it from each other instruction and user. The illustrated instructions already include the IFT and LPN, so that subsequently, when instructions are retrieved for execution, they can be fetched based on their firing times. As shown in Table 16, below, each instruction containing the extended information and the hardware tag is stored, as shown, for the above example:

TABLE 16

| CACHE0: | I4 (T16) (PE2) (ID2) |
|---------|----------------------|
| CACHE1: | I2 (T17) (PE0) (ID3) |
| CACHE2: | I0 (T16) (PE0) (ID0) |
|         | I5 (T17) (PE1) (ID4) |
| CACHE3: | I1 (T16) (PE1) (ID1) |
|         | I3 (T18) (PE0) (ID5) |

As stated previously, the purpose of the cache partition circuits 1522 is to provide a high speed buffer between the slow main memory 610 and the fast processor elements 640. Typically, the cache RAM 1610 is a high speed memory capable of being quickly accessed. If the RAM 1610 were a true associative memory, as can be witnessed in Table 16, each RAM 1610 could be addressed based upon instruction firing times (IFTs). At the present time, such associative memories are not economically justifiable and an IFT to cache address translation circuit 1620 must be utilized. Such a circuit is conventional in design and controls the addressing of each RAM 1610 over a bus 1520d. The purpose of circuit 1620 is to generate the RAM address of the desired instructions given the instruction firing time. Hence, for instruction firing time T16, CACHE0, CACHE2, and CACHE3, as seen in Table 16, would produce instructions I4, I0, and I1 respectively.

When the cache RAMs 1610 are addressed, those instructions associated with a specific firing time are delivered over lines 1624 into a tag compare and privilege check circuit 1630. The purpose of the tag compare and privilege check circuit 1630 is to compare the hardware tags (ID) to gener-

ated tags to verify that the proper instruction has been delivered. The reference tag is generated through a second tag generation circuit 1632 which is interconnected to the tag compare and privilege check circuit 1630 over a line 1520e. A privilege check is also performed on the delivered instruction to verify that the operation requested by the instruction is permitted given the privilege status of the process (e.g., system program, application program, etc.). This is a conventional check performed by computer processors which support multiple levels of processing states. A hit/miss circuit 1640 determines which RAMs 1610 have delivered the proper instructions to the PIQ bus interface unit 1544 in response to a specific instruction fetch request.

For example, and with reference back to Table 16, if the RAMs 1610 are addressed by circuit 1620 for instruction firing time T16, CACHE0, CACHE2, and CACHE3 would respond with instructions thereby comprising a hit indication on those cache partitions. Cache 1 would not respond and that would constitute a miss indication and this would be determined by circuit 1640 over line 1520g. Thus, each instruction, for instruction firing time T16, is delivered over bus 1632 into the SCSM attacher 1650 wherein dynamic SCSM information, if any, is added to the instruction by an SCSM attacher hardware 1650. For example, hardware 1650 can replace the static SCSM procedural level information (which is a relative value) with the actual procedural level values. The actual values are generataed from a procedural level counter data and the static SCSM information.

When all of the instructions associated with an individual firing time have been read from the RAM 1610, the hit and miss circuit 1640 over lines 1646 informs the instruction cache control unit 1660 of this information. The instruction cache context control unit 1660 contains the next instruction firing time register, a part of the instruction cache control 1518 which increments the instruction firing time to the next value. Hence, in the example, upon the completion of reading all instructions associated with instruction firing time T16, the instruction cache context control unit 1660 increments to the next firing time, T17, and delivers this information over lines 1664 to an access resolution circuit 1670, and over lines 1520f to the tag compare and privilege check circuit 1630. Also note that there may be firing times which have no valid instructions, possibly due to operational dependencies detected by the TOLL software. In this case, no instructions would be fetched from the cache and transmitted to the PIQ interface.

The access resolution circuit 1670 coordinates which circuitry has access to the instruction cache RAMs 1610. Typically, these RAMs can satisfy only a single request at each clock cycle. Since there could be two requests to the RAMs at one time, an arbitration method must be implemented to determine which circuitry obtains access. This is a conventional issue in the design of cache memory, and the access resolution circuit resolves the priority question as is well known in the field.

The present invention can and preferably does support several users simultaneously in both time and space. In previous prior art approaches (CDC, IBM, etc.), multi-user support was accomplished solely by timesharing the processor(s). In other words, the processors were shared in time. In this system, multi-user support is accomplished (in space) by assigning an LRD to each user that is given time on the processor elements. Thus, there is a spatial aspect to the sharing of the processor elements. The operating system of the machine deals with those users assigned to the same LRD in a timeshared manner, thereby adding the temporal dimension to the sharing of the processors.

US 6,253,313 B1

33

Multi-user support is accomplished by the multiple LRDs, the use of plural processor elements, and the multiple context files 660 supporting the register files and condition code storage. As several users may be executing in the processor elements at the same time, additional pieces of information must be attached to each instruction prior to its execution to uniquely identify the instruction source and any resources that it may use. For example, a register identifier must contain the absolute value of the subroutine procedural level and the context identifier as well as the actual register number. Memory addresses must also contain the LRD identifier from which the instruction was issued to be properly routed through the LRD-Memory interconnection network to the appropriate data cache.

The additional and required information comprises two components, a static and a dynamic component; and the information is termed "shared context storage mapping" (SCSM). The static information results from the compiler output and the TOLL software gleans the information from the compiler generated instruction stream and attaches the register information to the instruction prior to its being received by an LRD.

The dynamic information is hardware attached to the instruction by the LRD prior to its issuance to the processors. This information is composed of the context/LRD identifier corresponding to the LRD issuing the instruction, the absolute value of the current procedural level of the instruction, the process identifier of the current instruction stream, and preferably the instruction status information that would normally be contained in the processors of a system having processors that are not context free. This later information would be composed of error masks, floating point format modes, rounding modes, and so on.

In the operation of the circuitry in FIG. 16, one or more execution sets are delivered into the instruction cache circuitry. The header information for each set is delivered to one or more successive cache partitions and is routed to the context control unit 1660. The instructions in the execution set are then individually, on a round robin basis, routed to each successive cache partition unit 1522. A hardware identification tag is attached to each instruction and the instruction is then stored in RAM 1610. As previously discussed, each execution set is of sufficient length to minimize instruction cache defaults and the RAM 1610 is of sufficient size to store the execution sets. When the processor elements require the instructions, the number and cache locations of the valid instructions matching the appropriate IFTs are determined. The instructions stored in the RAM's 1610 are read out; the identification tags are verified; and the privilege status checked. The instructions are then delivered to the PIQ bus interface unit 1544. Each instruction that is delivered to the PIQ bus interface unit 1544, as is set forth in Table 17, includes the identification tag (ID) and the hardware added SCSM information.

TABLE 17

| CACHE0: | I4 (T16) (PE2) (ID2) (SCSM0) |
| CACHE1: | I2 (T17) (PE0) (ID3) (SCSM1) |
| CACHE2: | I0 (T16) (PE0) (ID0) (SCSM2) |
|         | I5 (T17) (PE1) (ID4) (SCSM3) |
| CACHE3: | I1 (T16) (PE1) (ID1) (SCSM4) |
|         | I3 (T18) (PE0) (ID5) (SCSM5) |

If an instruction is not stored in RAM 1610, a cache miss occurs and a new execution set containing the instruction is read from main memory over lines 1523.

In FIG. 17, the details of the PIQ bus interface unit 1544 and the PIQ buffer unit 1560 are set forth. Referring to FIG.

34

17, the PIQ bus interface unit 1544 receives instructions as set forth in Table 17, above, over lines 1536. A search tag hardware 1702 has access to the value of the present instruction firing time over lines 1549 and searches the cache memories 1522 to determine the address(es) of those registers containing instructions having the correct firing times. The search tag hardware 1702 then makes available to the instruction cache control circuitry 1518 the addresses of those memory locations for determination by the instruction cache control of which instructions to next select for delivery to the PIQ bus interface 1544.

These instructions access, in parallel, a two-dimensional array of bus interface units (BIU's) 1700. The bus interface units 1700 are interconnected in a full access non-blocking network by means of connections 1710 and 1720, and connect over lines 1552 to the PIQ buffer unit 1560. Each bus interface unit (BIU) 1700 is a conventional address comparison circuit composed of: TI 74L85 4 bit magnitude comparators, Texas Instruments Company, P.O. Box 225012, Dallas, Tex. 75265. In the matrix multiply example, for instruction firing time T16, CACHE0 contains instruction I4 and CACHE3 (corresponding to CACHE n in FIG. 17) contains instruction I1. The logical processor number assigned to instruction I4 is PE2. The logical processor number PE2 activates a select (SEL) signal of the bus interface unit 1700 for processor instruction queue 2 (this is the BIU3 corresponding to the CACHE0 unit containing the instruction). In this example, only that BIU3 is activated and the remaining bus interface units 1700 for that BIU3 row and column are not activated. Likewise, for CACHE3 (CACHE n in FIG. 17), the corresponding BIU2 is activated for processor instruction QUEUE 1.

The PIQ buffer unit 1560 is comprised of a number of processor instruction queues 1730 which store the instructions received from the PIQ bus interface unit 1544 in a first in-first out (FIFO) fashion as shown in Table 18:

TABLE 18

| PIQ0 | PIQ1 | PIQ2 | PIQ3 |
|------|------|------|------|
| I0   | I1   | I4   | —    |
| I2   | —    | —    | —    |
| I3   | —    | —    | —    |

In addition to performing instruction queuing functions, the PIQ's 1730 also keep track of the execution status of each instruction that is issued to the processor elements 640. In an ideal system, instructions could be issued to the processor elements every clock cycle without worrying about whether or not the instructions have finished execution. However, the processor elements 640 in the system may not be able to complete an instruction every clock cycle due to the occurrence of exceptional conditions, such as a data cache miss and so on. As a result, each PIQ 1730 tracks all instructions that it has issued to the processor elements 640 that are still in execution. The primary result of this tracking is that the PIQ's 1730 perform the instruction clocking function for the LRD 620. In other words, the PIQ's 1730 determine when the next firing time register can be updated when executing straightline code. This in turn begins a new instruction fetch cycle.

Instruction clocking is accomplished by having each PIQ 1730 form an instruction done signal that specifies that the instructions issued by a given PIQ either have executed or, in the case of pipelined PE's, have proceeded to the next stage. This is then combined with all other PIQ instruction done signals from this LRD and is used to gate the increment

US 6,253,313 B1

35

signal that increments the next firing time register. The "done" signals are delivered over lines 1564 to the instruction cache control 1518.

Referring to Figure 18, the PIQ processor assignment circuit 1570 contains a two dimensional array of network interface units (NIU's) 1800 interconnected as a full access switch to the PE-LRD network 650 and then to the various processor elements 640. Each network interface unit (NIU) 1800 is comprised of the same circuitry as the bus interface units (BIU) 1700 of FIG. 17. In normal operation, the processor instruction queue #0 (PIQ0) can directly access processor element 0 by activating the NIU0 associated with the column corresponding to queue #0, the remaining network interface units NIU0, NIU1, NIU2, NIU3 of the PIQ processor alignment circuit for that column and row being deactivated. Likewise, processor instruction queue #3 (PIQ3) normally accesses processor element 3 by activating the NIU3 of the column associated with queue #3, the remaining NIU0, NIU1 NIU2, and NIU3 of that column and row being deactivated. The activation of the network interface units 1800 is under the control of an instruction select and assignment unit 1810.

Unit 1810 receives signals from the PIQ's 1730 within the LRD that the unit 1810 is a member of over lines 1811, from all other units 1810 (of other LRD's) over lines 1813, and from the processor elements 640 through the network 650. Each PIQ 1730 furnishes the unit 1810 with a signal that corresponds to "I have an instruction that is ready to be assigned to a processor." The other PIQ buffer units furnish this unit 1810 and every other unit 1810 with a signal that corresponds to "My PIQ 1730 (#x) has an instruction ready to be assigned to a processor." Finally, the processor elements furnish each unit 1810 in the system with a signal that corresponds to "I can accept a new instruction."

The unit 1810 on an LRD transmits signals to the PIQs 1730 of its LRD over lines 1811, to the network interface units 1800 of its LRD over lines 1860 and to the other units 1810 of the other LRDs in the system over lines 1813. The unit 1810 transmits a signal to each PIQ 1730 that corresponds to "Gate your instruction onto the PE-LRD interface bus (650)." The unit transmits a select signal to the network interface units 1800. The unit 1810 transmits a signal that corresponds to "I have used processor element #x" to each other unit 1810 in the system for each processor which it is using.

In addition, each unit 1810 in each LRD has associated with it a priority that corresponds to the priority of the LRD. This is used to order the LRDs into an ascending order from zero to the number of LRDs in the system. The method used for assigning the processor elements is as follows. Given that the LRDs are ordered, many allocation schemes are possible (e.g., round robin, first come first served, time slice, etc.). However, these are implementation details and do not impact the functionality of this unit under the teachings of the present invention.

Consider the LRD with the current highest priority. This LRD gets all the processor elements that it requires and assigns the instructions that are ready to be executed to the available processor elements. If the processor elements are context free, the processor elements can be assigned in any manner whatsoever. Typically, however, assuming that all processors are functioning correctly, instructions from PIQ #0 are routed to processor element #0, provided of course, processor element #0 is available.

The unit 1810 in the highest priority LRD then transmits this information to all other units 1810 in the system. Any processors left open are then utilized by the next highest

36

priority LRD with instructions that can be executed. This allocation continues until all processors have been assigned. Hence, processors may be assigned on a priority basis in a daisy chained manner.

If a particular processor element, for example, element 1 has failed, the instruction selective assignment unit 1810 can deactivate that processor element by deactivating all network instruction units NIU1. It can then, through hardware, reorder the processor elements so that, for example, processor element 2 receives all instructions logically assigned to processor element 1, processor element 3 is now assigned to receive all instructions logically assigned to processor 2, etc. Indeed, redundant processor elements and network interface units can be provided to the system to provide for a high degree of fault tolerance.

Clearly, this is but one possible implementation. Other methods are also realizable.

b. Branch Execution Unit (BEU)

Referring to FIG. 19, the Branch Execution Unit (BEU) 1548 is the unit in the present invention responsible for the execution of all branch instructions which occur at the end of each basic block. There is, in the illustrated embodiment, one BEU 1548 for each supported context and so, with reference to FIG. 6, "n" supported contexts require "n" BEU's. The illustrated embodiment uses one BEU for each supported context because each BEU 1548 is of simple design and, therefore, the cost of sharing a BEU between plural contexts would be more expensive than allowing each context to have its own BEU.

The BEU 1548 executes branches in a conventional manner with the exception that the branch instructions are executed outside the PE's 640. The BEU 1548 evaluates the branch condition and, when the target address is selected, generates and places this address directly into the next instruction fetch register. The target address generation is conventional for unconditional and conditional branches that are not procedure calls or returns. The target address can be (a) taken directly from the instruction, (b) an offset from the current contents of the next instruction fetch register, or (c) an offset of a general purpose register of the context register file.

A return branch from a subroutine is handled in a slightly different fashion. To understand the subroutine return branch, discussion of the subroutine call branch is required. When the branch is executed, a return address is created and stored. The return address is normally the address of the instruction following the subroutine call. The return address can be stored in a stack in memory or in other storage local to the branch execution unit. In addition, the execution of the subroutine call increments the procedural level counter.

The return from a subroutine branch is also an unconditional branch. However, rather than containing the target address within the instruction, this type of branch reads the previously stored return address from storage, decrements the procedural level counter, and loads the next instruction fetch register with the return address. The remainder of the disclosure discusses the evaluation and execution of conditional branches. It should be noted the that techniques described also apply to unconditional branches, since these are, in effect, conditional branches in which the condition is always satisfied. Further, these same techniques also apply to the subroutine call and return branches, which perform the additional functions described above.

To speed up conditional branches, the determination of whether a conditional branch is taken or not, depends solely on the analysis of the appropriate set of condition codes. Under the teachings of the present invention, no evaluation

US 6,253,313 B1

37                                                    38

of data is performed other than to manipulate the condition codes appropriately. In addition, an instruction, which generates a condition code that a branch will use, can transmit the code to BEU 1548 as well as to the condition code storage. This eliminates the conventional extra waiting time required for the code to become valid in the condition code storage prior to a BEU being able to fetch it.

The present invention also makes extensive use of delayed branching to guarantee program correctness. When a branch has executed and its effects are being propagated in the system, all instructions that are within the procedural domain of the branch must either have been executed or be in the process of being executed, as discussed in connection with the example of Table 6. In other words, changing the next-instruction pointer (in response to the branch) takes place after the current firing time has been updated to point to the firing time that follows the last (temporally executed) instruction of the branch. Hence, in the example of Table 6, instruction I5 at firing time T17 is delayed until the completion of T18 which is the last firing time for this basic block. The instruction time for the next basic block is then T19.

The functionality of the BEU 1548 can be described as a four-state state machine:

    Stage 1: Instruction decode
        Operation decode
        Delay field decode
        Condition code access decode
    Stage 2: Condition code fetch/receive
    Stage 3: Branch operation evaluation
    Stage 4: Next instruction fetch location and firing time update

Along with determining what operation to be performed, the first stage also determines how long fetching can continue to take place after receipt of the branch by the BEU, and how the BEU is to access the condition codes for a conditional branch, that is, are they received or fetched.

Referring to FIG. 19, the branch instruction is delivered over bus 1546 from the PIQ bus interface unit 1544 into the instruction register 1900 of the BEU 1548. The fields of the instruction register 1900 are designated as: FETCH/ ENABLE, CONDITION CODE ADDRESS, OP CODE, DELAY FIELD, and TARGET ADDRESS. The instruction register 1900 is connected over lines 1910a and 1910b to a condition code access unit 1920, over lines 1910c to an evaluation unit 1930, over lines 1910d to a delay unit 1940, and over lines 1910e to a next instruction interface 1950.

Once an instruction has been issued to BEU 1548 from the PIQ bus interface unit 1544, instruction fetching must be held up until the value in the delay field has been determined. This value is measured relative to the receipt of the branch by the BEU, that is stage 1. If there are no instructions that may be overlapped with this branch, this field value is zero. In this case, instruction fetching is held up until the outcome of the branch has been determined. If this field is non-zero, instruction fetching may continue for a number of firing times given by the value in this field.

The condition code access unit 1920 is connected to the register file—PE network 670 over lines 1550 and to the evaluation unit 1930 over lines 1922. During stage 2 operation, the condition code access decode unit 1920 determines whether or not the condition codes must be fetched by the instruction, or whether the instruction that determines the branch condition delivers them. As there is only one instruction per basic block that will determine the conditional branch, there will never be more than one condition code received by the BEU for a basic block. As a result, the actual timing of when the condition code is

received is not important. If it comes earlier than the branch, no other codes will be received prior to the execution of the branch. If it comes later, the branch will be waiting and the codes received will always be the right ones. Note that the condition code for the basic block can include plural codes received at the same or different times by the BEU.

The evaluation unit 1930 is connected to the next instruction interface 1950 over lines 1932. The next instruction interface 1950 is connected to the instruction cache control circuit 1518 over lines 1549 and to the delay unit 1940 over lines 1942; and the delay unit 1940 is also connected to the instruction cache control unit 1518 over lines 1549.

During the evaluation stage of operation, the condition codes are combined according to a Boolean function that represents the condition being tested. In the final stage of operation, either fetching of the sequential instruction stream continues, if a conditional branch is not taken, or the next instruction pointer is loaded, if the branch is taken.

The impact of a branch in the instruction stream can be described as follows. Instructions, as discussed, are sent to their respective PIQ's 1730 by analysis of the resident logical processor number (LPN). Instruction fetching can be continued until a branch is encountered, that is, until an instruction is delivered to the instruction register 1900 of the BEU 1548. At this point, in a conventional system without delayed branching, fetching would be stopped until the resolution of the branch instruction is complete. See, for example, "Branch Prediction Strategies and Branch Target Buffer Design", J. F. K. Lee & A. J. Smith, IEEE Computer Magazine, January, 1984.

In the present system, which includes delayed branching, instructions must continue to be fetched until the next instruction fetched is the last instruction of the basic block to be executed. The time that the branch is executed is then the last time that fetching of an instruction can take place without a possibility of modifying the next instruction address. Thus, the difference between when the branch is fetched and when the effects of the branch are actually felt corresponds to the number of additional firing time cycles during which fetching can be continued.

The impact of this delay is that the BEU 1548 must have access to the next instruction firing time register of the cache controller 1518. Further, the BEU 1548 can control the initiation or disabling of the instruction fetch process performed by the instruction cache control unit 1518. These tasks are accomplished by signals over bus 1549.

In operation the branch execution unit (BEU) 1548 functions as follows. The branch instruction, such as instruction I5 in the example above, is loaded into the instruction register 1900 from the PIQ bus interface unit 1544. The contents of the instruction register then control the further operation of BEU 1548. The FETCH-ENABLE field indicates whether or not the condition code access unit 1920 should retrieve the condition code located at the address stored in the CC-ADX field (called FETCH) or whether the condition code will be delivered by the generating instruction.

If a FETCH is requested, the unit 1920 accesses the register file-PE network 670 (see FIG. 6) to access the condition code storage 2000 which is shown in FIG. 20. Referring to FIG. 20, the condition code storage 2000, for each context file, is shown in the generalized case. A set of registers $CC_{xy}$ are provided for storing condition codes for procedural level y. Hence, the condition code storage 2000 is accessed and addressed by the unit 1920 to retrieve, pursuant to a FETCH request, the necessary condition code. The actual condition code and an indication that the condi-

US 6,253,313 B1

39

tion code is received by the unit 1920 is delivered over lines 1922 to the evaluation unit 1930. The OPCODE field, delivered to the evaluation unit 1930, in conjunction with the received condition code, functions to deliver a branch taken signal over line 1932 to the next instruction interface 1950. The evaluation unit 1930 is comprised of standard gate arrays such as those from LSI Logic Corporation, 1551 McCarthy Blvd., Milpitas, Calif. 95035.

The evaluation unit 1930 accepts the condition code set that determines whether or not the conditional branch is taken, and under control of the OPCODE field, combines the set in a Boolean function to generate the conditional branch taken signal.

The next instruction interface 1950 receives the branch target address from the TARGET-ADX field of the instruction register 1900 and the branch taken signal over line 1932. However, the interface 1950 cannot operate until an enable signal is received from the delay unit 1940 over lines 1942.

The delay unit 1940 determines the amount of time that instruction fetching can be continued after the receipt of a branch instruction by the BEU. Previously, it has been described that when a branch instruction is received by the BEU, instruction fetching continues for one more cycle and then stops. The instruction fetched during this cycle is held up from passing through PIQ bus interface unit 1544 until the length of the delay field has been determined. For example, if the delay field is zero (implying that the branch is to be executed immediately), these instructions must still be withheld from the PIQ bus buffer unit until it is determined whether or not these are the right instructions to be fetched. If the delay field is non-zero, the instructions would be gated into the PIQ buffer unit as soon as the delay value was determined to be non-zero. The length of the delay is obtained from DELAY field of the instruction register 1900. The delay unit receives the delay length from register 1900 and clock impulses from the context control 1518 over lines 1549. The delay unit 1940 decrements the value of the delay at each clock pulse; and when fully decremented, the interface unit 1950 becomes enabled.

Hence, in the discussion of Table 6, instruction is assigned a firing time T17 but is delayed until firing time T18. During the delay time, the interface 1950 signals the instruction cache control 1518 over line 1549 to continue to fetch instructions to finish the current basic block. When enabled, the interface unit 1950 delivers the next address (that is, the branch execution address) for the next basic block into the instruction cache control 1518 over lines 1549.

In summary and for the example on Table 6, the branch instruction I5 is loaded into the instruction register 1900 during time T17. However, a delay of one firing time (DELAY) is also loaded into the instruction register 1900 as the branch instruction cannot be executed until the last instruction I3 is processed during time T18. Hence, even though the instruction I5 is loaded in register 1900, the branch address for the next basic block, which is contained in the TARGET ADDRESS, does not become effective until the completion of time T18. In the meantime, the next instruction interface 1950 issues instructions to the cache control 1518 to continue processing the stream of instructions in the basic block. Upon the expiration of the delay, the interface 1950 is enabled, and the branch is executed by delivering the address of the next basic block to the instruction cache control 1518.

Note that the delay field is used to guarantee the execution of all instructions in the basic block governed by this branch in single cycle context free PE's. A small complexity is

40

encountered when the PE's are pipelined. In this case, there exist data dependencies between the instructions from the basic block just executed, and the instructions from the basic block to be executed. The TOLL software can analyze these dependencies when the next basic block is only targeted by the branch from this basic block. If the next basic block is targeted by more than one branch, the TOLL software cannot resolve the various branch possibilities and lets the pipelines drain, so that no data dependencies are violated. One mechanism for allowing the pipelines to drain is to insert NO-OP (no operation) instructions into the instruction stream. An alternate method provides an extra field in the branch instruction which inhibits the delivery of new instructions to the processor elements for a time determined by the data in the extra field.

c. Processor Elements (PE)

So far in the discussions pertaining to the matrix multiply example, a single cycle processor element has been assumed. In other words, an instruction is issued to the processor element and the processor element completely executes the instruction before proceeding to the next instruction. However, greater performance can be obtained by employing pipelined processor elements. Accordingly, the tasks performed by the TOLL software change slightly. In particular, the assignment of the processor elements is more complex than is shown in the previous example; and the hazards that characterize a pipeline processor must be handled by the TOLL software. The hazards that are present in any pipelined processor manifest themselves as a more sophisticated set of data dependencies. This can be encoded into the TOLL software by one practiced in the art. See for example, T. K. R. Gross, Stanford University, 1983, "Code Optimization of Pipeline Constraints", Doctorate Dissertation Thesis.

The assignment of the processors is dependent on the implementation of the pipelines and again, can be performed by one practiced in the art. A key parameter is determining how data is exchanged between the pipelines. For example, assume that each pipeline contains feedback paths between its stages. In addition, assume that the pipelines can exchange results only through the register sets 660. Instructions would be assigned to the pipelines by determining sets of dependent instructions that are contained in the instruction stream and then assigning each specific set to a specific pipeline. This minimizes the amount of communication that must take place between the pipelines (via the register set), and hence speeds up the execution time of the program. The use of the logical processor number guarantees that the instructions will execute on the same pipeline.

Alternatively, if there are paths available to exchange data between the pipelines, dependent instructions may be distributed across several pipeline processors instead of being assigned to a single pipeline. Again, the use of multiple pipelines and the interconnection network between them that allows the sharing of intermediate results manifests itself as a more sophisticated set of data dependencies imposed on the instruction stream. Clearly, the extension of the teachings of this invention to a pipelined system is within the skill of one practiced in the art.

Importantly, the additional data (chaining) paths do not change the fundamental context free nature of the processor elements of the present invention. That is, at any given time (for example, the completion of any given instruction cycle), the entire process state associated with a given program (that is, context) is captured completely external to the processor elements. Data chaining results merely in a transitory replication of some of the data generated within the processor elements during a specific instruction clock cycle.

US 6,253,313 B1

41                                                            42

Referring to FIG. 21, a particular processor element 640 has a four-stage pipeline processor element. All processor elements 640 according to the illustrated embodiment are identical. It is to be expressly understood, that any prior art type of processor element such as a micro-processor or other pipeline architecture could not be used under the teachings of the present invention, because such processors retain substantial state information of the program they are processing. However, such a processor could be programmed with software to emulate or simulate the type of processor necessary for the present invention.

The design of the processor element is determined by the instruction set architecture generated by the TOLL software and, therefore, from a conceptual viewpoint, is the most implementation dependent portion of this invention. In the illustrated embodiment shown in FIG. 21, each processor element pipeline operates autonomously of the other processor elements in the system. Each processor element is homogeneous and is capable, by itself, of executing all computational and data memory accessing instructions. In making computational executions, transfers are from register to register and for memory interface instructions, the transfers are from memory to registers or from registers to memory.

Referring to FIG. 21, the four-stage pipeline for the processor element 640 of the illustrated embodiment includes four discrete instruction registers 2100, 2110, 2120, and 2130. Each processor element also includes four stages: stage 1, 2140; stage 2, 2150; stage 3, 2160, and stage 4, 2170. The first instruction register 2100 is connected through the network 650 to the PIQ processor assignment circuit 1570 and receives that information over bus 2102. The instruction register 2100 then controls the operation of stage 1 which includes the hardware functions of instruction decode and register 0 fetch and register 1 fetch. The first stage 2140 is interconnected to the instruction register over lines 2104 and to the second instruction register 2110 over lines 2142. The first stage 2140 is also connected over a bus 2144 to the second stage 2150. Register 0 fetch and register 1 fetch of stage 1 are connected over lines 2146 and 2148, respectively, to network 670 for access to the register file 660.

The second instruction register 2110 is further interconnected to the third instruction register 2120 over lines 2112 and to the second stage 2150 over lines 2114. The second stage 2150 is also connected over a bus 2152 to the third stage 2160 and further has the memory write (MEM WRITE) register fetch hardware interconnected over lines 2154 to network 670 for access to the register file 660 and its condition code (CC) hardware connected over lines 2156 through network 670 to the condition code storage of context file 660.

The third instruction register 2120 is interconnected over lines 2122 to the fourth instruction register 2130 and is also connected over lines 2124 to the third stage 2160. The third stage 2160 is connected over a bus 2162 to the fourth stage 2170 and is further interconnected over lines 2164 through network 650 to the data cache interconnection network 1590.

Finally, the fourth instruction register 2130 is interconnected over lines 2132 to the fourth stage, and the fourth stage has its store hardware (STORE) output connected over lines 2172 and its effective address update (EFF. ADD.) hardware circuit connected over lines 2174 to network 670 for access to the register file 660. In addition, the fourth stage has its condition code store (CC STORE) hardware connected over lines 2176 through network 670 to the condition code storage of context file 660.

The operation of the four-stage pipeline shown in FIG. 21 will now be discussed with respect to the example of Table 1 and the information contained in Table 19 which describes the operation of the processor element for each instruction.

TABLE 19

Instruction I0, (I1):

Stage 1 - Fetch Reg to form Mem-adx
Stage 2 - Form Mem-adx
Stage 3 - Perform Memory Read
Stage 4 - Store R0, (R1)

Instruction I2:

Stage 1 - Fetch Reg R0 and R1
Stage 2 - No-Op
Stage 3 - Perform multiply
Stage 4 - Store R2 and CC

Instruction I3:

Stage 1 - Fetch Reg R2 and R3
Stage 2 - No-Op
Stage 3 - Perform addition
Stage 4 - Store R3 and CC

Instruction I4:

Stage 1 - Fetch Reg R4
Stage 2 - No-Op
Stage 3 - Perform decrement
Stage 4 - Store R4 and CC

For instructions I0 and I1, the performance by the processor element 640 in FIG. 21 is the same except in stage 4. The first stage is to fetch the memory address from the register which contains the address in the register file. Hence, stage 1 interconnects circuitry 2140 over lines 2146 through network 670 to that register and downloads it into register 0 from the interface of stage 1. Next, the address is delivered over bus 2144 to stage 2, and the memory write hardware forms the memory address. The memory address is then delivered over bus 2152 to the third stage which reads memory over 2164 through network 650 to the data cache interconnection network 1590. The results of the read operation are then stored and delivered to stage 4 for storage in register R0. Stage 4 delivers the data over lines 2172 through network 670 to register R0 in the register file. The same operation takes place for instruction I1 except that the results are stored in register 1. Hence, the four stages of the pipeline (Fetch, Form Memory Address, Perform Memory Read, and Store The Results) flow data through the pipe in the manner discussed, and when instruction I0 has passed through stage 1, the first stage of instruction I1 commences. This overlapping or pipelining is conventional in the art.

Instruction I2 fetches the information stored in registers R0 and R1 in the register file 660 and delivers them into registers REG0 and REG1 of stage 1. The contents are delivered over bus 2144 through stage 2 as a no operation and then over bus 2152 into stage 3. A multiply occurs with the contents of the two registers, the results are delivered over bus 2162 into stage 4 which then stores the results over lines 2172 through network 670 into register R2 of the register file 660. In addition, the condition code data is stored over lines 2176 in the condition code storage of context files 660.

Instruction I3 performs the addition of the data in registers R2 and R3 in the same fashion, to store the results, at stage 4, in register R3 and to update the condition code data for that instruction. Finally, instruction I4 operates in the same fashion except that stage 3 performs a decrement of the contents of register R4.

Hence, according to the example of Table I, the instructions for PE0, would be delivered from the PIQ0 in the

US 6,253,313 B1

**43**

following order: I0, I2, and I3. These instructions would be sent through the PE0 pipeline stages (S1, S2, S3, and S4), based upon the instruction firing times (T16, T17, and T18), as follows:

TABLE 20

| PE | Inst | T16 | T17 | T18 | T19 | T20 | T21 |
|----|------|-----|-----|-----|-----|-----|-----|
| PE0: | I0 | S1 | S2 | S3 | S4 | | |
| | I2 | | S1 | S2 | S3 | S4 | |
| | I3 | | | S1 | S2 | S3 | S4 |
| PE1: | I1 | S1 | S2 | S3 | S4 | | |
| PE2: | I4 | S1 | S2 | S3 | S4 | | |

The schedule illustrated in Table 20 is not however possible unless data chaining is introduced within the pipeline processor (intraprocessor data chaining) as well as between pipeline processors (interprocessor data chaining). The requirement for data chaining occurs because an instruction no longer completely executes within a single time cycle illustrated by, for example, instruction firing time T16. Thus, for a pipeline processor, the TOLL software must recognize that the results of the store which occurs at stage 4 (T19) of instructions I0 and I1 are needed to perform the multiply at stage 3 (T19) of instruction I2, and that fetching of those operands normally takes place at stage 1 (T17) of instruction I2. Accordingly, in the normal operation of the pipeline, for processors PE0 and PE1, the operand data from registers R0 and R1 is not available until the end of firing time T18 while it is needed by stage 1 of instruction I2 at time T17.

To operate according to the schedule illustrated in Table 20, additional data (chaining) paths must be made available to the processors, paths which exist both internal to the processors and between processors. These paths, well known to those practiced in the art, are the data chaining paths. They are represented, in FIG. 21, as dashed lines 2180 and 2182. Accordingly, therefore, the resolution of data dependencies between instructions and all scheduling of processor resources which are performed by the TOLL software prior to program execution, take into account the availability of data chaining when needed to make available data directly from the output, for example, of one stage of the same processor or a stage of a different processor. This data chaining capability is well known to those practiced in the art and can be implemented easily in the TOLL software analysis by recognizing each stage of the pipeline processor as being, in effect, a separate processor having resource requirements and certain dependencies, that is, that an instruction when started through a pipeline will preferably continue in that same pipeline through all of its processing stages. With this in mind, the speed up in processing can be observed in Table 20 where the three machine cycle times for the basic block are completed in a time of only six pipeline cycles. It should be borne in mind that the cycle time for a pipeline is approximately one-fourth the cycle time for the non-pipeline processor in the illustrated embodiment of the invention.

The pipeline of FIG. 21 is composed of four equal (temporal) length stages. The first stage 2140 performs the instruction decode, determines what registers to fetch and store, and performs up to two source register fetches which can be required for the execution of the instruction.

The second stage 2150 is used by the computational instructions for the condition code fetch if required. It is also the effective address generation stage for the memory interface instructions.

**44**

The effective address operations that are supported in the preferred embodiment of the invention are:

1. Absolute address
   The full memory address is contained in the instruction.
2. Register indirect
   The full memory address is contained in a register.
3. Register indexed/based
   The full memory address is formed by combining the designated registers and immediate data.
   a. Rn op K
   b. Rn op Rm
   c. Rn op K op Rm
   d. Rn op Rm op K

where "op" can be addition (+), subtraction (−), or multiplication (*) and "K" is a constant.

As an example, the addressing constructs presented in the matrix multiply inner loop example are formed from case 3-a where the constant "K" is the length of a data element within the array and the operation is addition (+).

At a conceptual level, the effective addressing portion of a memory access instruction is composed of three basic functions; the designation and procurement of the registers and immediate data needed for the calculation, the combination of these operands in order to form the desired address, and if necessary, updating of any one of the registers involved. This functionality is common in the prior art and is illustrated by the autoincrement and autodecrement modes of addressing available in the DEC processor architecture. See, for example, DEC VAX Architecture Handbook.

Aside from the obvious hardware support required, the effective addressing is supported by the TOLL software, and impacts the TOLL software by adding functionality to the memory accessing instructions. In other words, an effective address memory access can be interpreted as a concatenation of two operations, the first being the effective address calculation and the second being the actual memory access. This functionality can be easily encoded into the TOLL software by one skilled in the art in much the same manner as an add, subtract or multiply instruction would be.

The described effective addressing constructs are to be interpreted as but one possible embodiment of a memory accessing system. There are a plethora of other methods and modes for generating a memory address that are known to those skilled in the art. In other words, the effective addressing constructs described above are for design completeness only, and are not to be construed as a key element in the design of the system.

Referring to FIG. 22, various structures of data or data fields within the pipeline processor element of FIG. 21 are illustrated for a system which is a multi-user system in both time and space. As a result, across the multiple pipelines, instructions from different users may be executing, each with its own processor state. As the processor state is not typically associated with the processor element, the instruction must carry along the identifiers that specify this state. This processor state is supported by the LRD, register file and condition code file assigned to the user.

A sufficient amount of information must be associated with each instruction so that each memory access, condition code access or register access can uniquely identify the target of the access. In the case of the registers and condition codes, this additional information constitutes the absolute value of the procedural level (PL) and context identifiers (CI) and is attached to the instruction by the SCSM attachment unit 1650. This is illustrated in FIGS. 22a, 22b and 22c respectively. The context identifier portion is used to determine which register or condition code plane (FIG. 6) is

US 6,253,313 B1

45

being accessed. The procedural level is used to determine which procedural level of registers (FIG. 13) is to be accessed.

Memory accesses also require that the LRD that supports the current user be identified so that the appropriate data cache can be accessed. This is accomplished through the context identifier. The data cache access further requires that a process identifier (PID) for the current user be available to verify that the data present in the cache is indeed the data desired. Thus, an address issued to the data cache takes the form of FIG. 22d. The miscellaneous field is composed of additional information describing the access, for example, read or write, user or system, etc.

Finally, due to the fact that there can be several users executing across the pipelines during a single time interval, information that controls the execution of the instructions, and which would normally be stored within the pipeline, must be associated with each instruction instead. This information is reflected in the ISW field of an instruction word as illustrated in FIG. 22a. The information in this field is composed of control fields like error masks, floating point format descriptors, rounding mode descriptors, etc. Each instruction would have this field attached, but, obviously, may not require all the information. This information is used by the ALU stage 2160 of the processor element.

This instruction information relating to the ISW field, as well as the procedural level, context identification and process identifier, are attached dynamically by the SCSM attacher (1650) as the instruction is issued from the instruction cache.

Although the system of the present invention has been specifically set forth in the above disclosure, it is to be understood that modifications and variations can be made thereto which would still fall within the scope and coverage of the following claims.

We claim:

1. A parallel processor system for processing natural concurrencies in streams of low level instructions contained in a plurality of programs in said system, each of said streams having a plurality of single entry-single exit (SESE) basic blocks (BBs), said system comprising:

means (160) for statically adding intelligence to each instruction in each of said plurality of basic blocks for each said program, said added intelligence at least having a logical processor number (LPN) and an instruction firing time (IFT)

a plurality of contexts (660), each of said contexts being assigned to one of said plurality of programs for processing one of said programs, each of said contexts having at least a plurality of registers and a plurality of condition code storages for containing processing status information,

a plurality of logical resource drivers (LRDs) with each logical resource driver being assigned to on eof said plurality of contexts, each of said logical resource drivers being receptive of said basic blocks corresponding to the program instruction stream of said assigned program from said adding means, each of said logical resource drivers comprising:

(a) a plurality of queues (1560), and

(b) means (630, 6200) operative on said plurality of said basic blocks containing said intelligence from said adding means for delivering said instruction sin each said basic block into said plurality of queues based on said logical processor number, said instruction sin each said queue being entered according to said instruction firing time wherein the earliest instruction firing time is entered first,

46

a plurality of individual processor elements (PEs), each of said processor elements being free of any context information,

means (650) connecting said plurality of processor elements to said plurality of logical resource drivers for transferring said instructions with the earliest instruction firing time first in said queues from each of said logical resource drivers, in a predetermined order, to individually assigned processor elements, each said processor element being capable of processing said transferred instruction,

first means (670) for connecting each of said processor elements with any one of said plurality of contexts, each of said processor elements being capable of accessing said plurality of registers and condition code storages in a program's context during the processing of the program's instruction,

a plurality of memory locations (610), and

second means (620, 630) for connecting each of said processor elements with any one of said plurality of memory locations, each said processor element being capable of accessing said memory locations during said processing of each said instruction.

2. The processor system of claim 1 further comprising, a system for using multiple sets of condition values, the processor system comprising:

an opcode storage configured to buffer a plurality of opcodes corresponding to at least some of said low level instructions to be processed;

a first circuit coupled to said opcode storage, said first circuit configured to receive an opcode of a first type of instruction and to generate a set of at least one condition value;

a condition storage coupled to said first circuit, said condition storage configured to store a plurality of said sets of condition values;

a second circuit coupled to said opcode storage, said second circuit configured to receive an opcode of a second type of instruction and to generate a set of at least one output value, said output value for each second said type of instruction depending on a particular one of said stored sets of condition values; and

an access circuit coupled between said condition storage, and said second circuit, said access circuit configured to access said particular stored set of condition values for each said opcode of second type.

3. In an instruction processing apparatus, a system for using multiple sets of condition values within a single context, the system comprising:

an opcode storage configured to buffer a plurality of opcodes corresponding to at least some of said instructions to be processed from said context;

a first circuit coupled to said opcode storage, said first circuit configured to receive opcodes of a first type of instruction and addresses for storing sets of at least one condition value, and to generate for each said opcode of said first type a set of at least one condition value associated with one of the addresses;

a condition storage coupled to said first circuit, said condition storage configured to store a plurality of said sets of condition values at storage locations based upon addresses received from the first circuit;

a second circuit coupled to said opcode storage, said second circuit configured to receive opcodes of a second type of instruction and condition storage

US 6,253,313 B1

47

addresses, and to generate a set of at least one output value, said output value for each said second type of instruction depending on a particular one of said stored sets of condition values associated with the condition storage address; and

an access circuit coupled between said condition storage and said second circuit, said access circuit configured to access by the condition storage address said particular one of said stored sets of condition values for each said opcode of said second type.

4. The system of claim 3 further wherein said first type of instruction consists of arithmetic and logic type instructions.

5. The system of claim 3 further wherein said second type of instruction consists of branch type instructions.

6. The system of claim 3 further wherein said plurality of sets of condition values comprises at least three sets of condition values.

7. The system of claim 6 further wherein there are four sets of condition values.

8. The system of claim 3 further wherein said access circuit comprises an address selection circuit.

9. The system of claim 8 further wherein said address selection circuit receives an address input specified by said second type of instruction.

10. The system of claim 3 further comprising third circuits that receive opcode inputs of said first type of instructions and generate additional sets of condition values.

11. The system of claim 3 further wherein said set of output values comprises a target address of a conditional branch type instruction.

12. The system of claim 3 further comprising a general purpose register file separate from said condition storage.

13. The system of claim 3 further wherein said sets of condition values are stored as condition codes, each said condition code comprising a plurality of flag bits.

14. The system of claim 13 further wherein one of said flag bits represents a zero result of said first type of instruction.

15. The system of claim 14 further wherein said first type of instruction is a decrement instruction.

16. The system of claim 3 further wherein said opcode storage comprises a processor instruction queue, said queue configured to buffer instructions waiting to be executed and to track the execution status of instructions that are issued.

17. The system of claim 3 further comprising an allocate circuit coupled between said first circuit and said condition storage, said allocate circuit configured to assign said set of condition values to a physical location in said condition storage.

18. The system of claim 17 further wherein said physical location is assigned based on an address specified by said first type of instruction.

48

19. A method of processing a stream of instructions within a single context using multiple sets of at least one condition value, a first type of said instructions each generating a set of at least one condition value and a second type of said instructions each producing a result that depends on one of said generated sets of at least one condition value, the method comprising:

issuing a first instruction of said first type with a first address for storing a first set of at least one condition value;

generating a first set of at least one condition value;

storing said first set of at least one condition value in a storage location having said first address in a condition storage, wherein said condition storage has a plurality of locations, each said location is associated with a different address and is configured to store a plurality of condition values;

no earlier than issuing said first instruction of said first type, issuing a second instruction of said first type with a second address for storing a second set of at least one condition value;

generating a second set of at least one condition value;

storing said second set of at least one condition value in a second storage location having said second address in said condition storage, wherein said first storage location and said second storage location are different storage locations in said condition storage;

no earlier than issuing said second instruction of said first type, issuing an instruction of said second type with said first address that depends on said first set of at least one condition value stored in said first storage location; and

accessing said first set of at least one condition value stored in said condition storage having said first address.

20. The method of claim 19 further wherein said processing of said first instruction of said first type comprises the step of decrementing a data value.

21. The method of claim 19 further wherein said processing of said instruction of said second type comprises the step of evaluating whether a branch is taken.

22. The method of claim 19 further wherein said processing step comprises the step of storing at least three sets of condition values.

23. The method of claim 22 further wherein there are four sets of condition values.

24. The method of claim 19 further comprising the step of generating a target address of a branch type instruction.

25. The method of claim 19 further wherein each step of storing sets of condition values comprises the step of storing condition codes, each said condition code having a plurality of flag bits.

* * * * *

# EXHIBIT D

## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/007,922 | 02/09/2006 | 6253313 | 33142.21 | 6363 |

20277        7590        05/29/2008

MCDERMOTT WILL & EMERY LLP
600 13TH STREET, N.W.
WASHINGTON, DC  20005-3096

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 05/29/2008

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,156 | 10/20/2006 | 6253313 | 33142.20 | 2960 |

20277      7590      05/29/2008

MCDERMOTT WILL & EMERY LLP
600 13TH STREET, N.W.
WASHINGTON, DC  20005-3096

| EXAMINER |
|---|
|  |

| ART UNIT | PAPER NUMBER |
|---|---|
|  |  |

DATE MAILED: 05/29/2008

Please find below and/or attached an Office communication concerning this application or proceeding.



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

David M. O'Dell, Haynes and Boone, LLP

901 Main Street, Suite 3100

Dallas, Texas 75202

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/007,922* ✓ *90/008,156*

PATENT NO. *6253313*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| Notice of Intent to Issue<br>Ex Parte Reexamination Certificate | Control No.<br>90/007,922 ∮ 90/008,156 | Patent Under Reexamination<br>6253313 | |
|---|---|---|---|
| | Examiner<br>Linh M. Nguyen | Art Unit<br>3992 | |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --

1. ☒ Prosecution on the merits is (or remains) closed in this *ex parte* reexamination proceeding. This proceeding is subject to reopening at the initiative of the Office or upon petition. *Cf.* 37 CFR 1.313(a). A Certificate will be issued in view of

    (a) ☒ Patent owner's communication(s) filed: *28 January 2008*.

    (b) ☐ Patent owner's late response filed: _____.

    (c) ☐ Patent owner's failure to file an appropriate response to the Office action mailed: _____.

    (d) ☐ Patent owner's failure to timely file an Appeal Brief (37 CFR 41.31).

    (e) ☒ Other: *Personal Interview on 04/22/08*.

    Status of *Ex Parte* Reexamination:

    (f) Change in the Specification: ☐ Yes ☒ No

    (g) Change in the Drawing(s): ☐ Yes ☒ No

    (h) Status of the Claim(s):

        (1) Patent claim(s) confirmed: *1-25*.

        (2) Patent claim(s) amended (including dependent on amended claim(s)): _____

        (3) Patent claim(s) cancelled: _____.

        (4) Newly presented claim(s) patentable: *26 and 27*.

        (5) Newly presented cancelled claims: _____.

        (6) Patent claim(s) ☐ previously ☐ currently disclaimed: _____

        (7) Patent claim(s) not subject to reexamination: _____.

2. ☒ Note the attached statement of reasons for patentability and/or confirmation. Any comments considered necessary by patent owner regarding reasons for patentability and/or confirmation must be submitted promptly to avoid processing delays. Such submission(s) should be labeled: "Comments On Statement of Reasons for Patentability and/or Confirmation."

3. ☐ Note attached NOTICE OF REFERENCES CITED (PTO-892).

4. ☐ Note attached LIST OF REFERENCES CITED (PTO/SB/08 or PTO/SB/08 substitute.).

5. ☐ The drawing correction request filed on _____ is: ☐ approved ☐ disapproved.

6. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some*   c)☐ None    of the certified copies have

        ☐ been received.

        ☐ not been received.

        ☐ been filed in Application No. _____.

        ☐ been filed in reexamination Control No. _____.

        ☐ been received by the International Bureau in PCT Application No. _____.

    * Certified copies not received: _____.

7. ☐ Note attached Examiner's Amendment.

8. ☒ Note attached Interview Summary (PTO-474).

9. ☐ Other: _____.

cc: Requester (if third party requester)

Application/Control Number: 90/007,922 *# 90/008,156*                    Page 2
Art Unit: 3992

## *EX PARTE* REEXAMINATION SECOND OFFICE ACTION

### *Summary*

This is a reexamination of U.S. Patent No. 6,253,313 ("the base patent"). An amendment

was submitted on 01/28/2008. Status of claims as follows:

Claims: 1- 25   Original;

Claims: 26-27   New.

### *Reasons for Patentability/Confirmation*

Claims 1-25 are confirmed.

Newly presented claims 26-27 are patentable.

The following is an examiner's statement of reasons for patentability and/or confirmation

of the claims found patentable in this reexamination proceeding:

The closest prior art fails to disclose or fairly suggest:

a) A plurality of contexts, each of the contexts being assigned to one of the plurality of

programs for processing one of the programs, each of the contexts having at least a plurality

of registers and a plurality of condition code storages for containing processing status

information, in combination with the remaining claimed limitations, as called for in independent

claim 1;

b) A second circuit coupled to said opcode storage, the second circuit configured to

receive opcodes of a second type of instruction and condition storage addresses, and to generate

a set of at least one output value, the output value for each the second type of instruction

Application/Control Number: 90/007,922                                    Page 3

Art Unit: 3992

depending on a particular one of the stored sets of condition values associated with the condition

storage address, in combination with the remaining claimed limitations, as called for in

independent claims 3 or 26 or 27; and

    c) Issuing an instruction of the second type with the first address that depends on the first

set of at least one condition value stored in the first storage location, in combination with the

remaining claimed limitations, as called for in independent claim 19.

    Any comments considered necessary by PATENT OWNER regarding the above

statement must be submitted promptly to avoid processing delays. Such submission by the patent

owner should be labeled: "Comments on Statement of Reasons for Patentability and/or

Confirmation" and will be placed in the reexamination file.

Application/Control Number: 90/007,922                                    Page 4

Art Unit: 3992

### NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to
provide that:

The patent owner's correspondence address for all communications
in an *ex parte* reexamination or an *inter partes* reexamination is
designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting*
> *Requirements for Ex Parte and Inter Partes*
> *Reexamination*, 72 FR 18892 (April 16, 2007)(Final
> Rule)

**The correspondence address for any pending reexamination**
**proceeding not having the same correspondence address as that of**
**the patent is, by way of this revision to 37 CFR 1.33(c),**
**automatically changed to that of the patent file as of the**
**effective date.**

This change is effective for any reexamination proceeding which
is pending before the Office as of May 16, 2007, including the
present reexamination proceeding, and to any reexamination
proceeding which is filed after that date.

Parties are to take this change into account when filing papers,
and direct communications accordingly.

In the event the patent owner's correspondence address listed in
the papers (record) for the present proceeding is different from
the correspondence address of the patent, it is strongly
encouraged that the patent owner affirmatively file a
Notification of Change of Correspondence Address in the
reexamination proceeding and/or the patent (depending on which
address patent owner desires), to conform the address of the
proceeding with that of the patent and to clarify the record as
to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

```
Reexamination and Amendment Practice         (571) 272-7703
Central Reexam Unit (CRU)                    (571) 272-7705
Reexamination Facsimile Transmission No.     (571) 273-9900
```

Application/Control Number: 90/007,922                                   Page 5

Art Unit: 3992

Please mail any communications to:

Mail Stop "Ex Parte Reexam"
Attn:  Central Reexamination Unit
Commissioner for Patents

P.O. Box 1450
Alexandria, VA 22313-1450

Please FAX any communications to:
(571) 273-9900
Central Reexamination Unit

Please hand-deliver any communications to:

Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

Any inquiry concerning this communication or earlier
communications from the Reexamination Legal Advisor or Examiner,
or as to the status of this proceeding, should be directed to
the Central Reexamination Unit at telephone number (571) 272-
7705.

Linh M. Nguyen
Primary Patent Examiner
Central Reexamination Unit 3992
(571) 272-1749

Conferees:

/James Menefee/

Primary Examiner – Central Reexamination Unit 3992

MARK J. REINHART
CRU SPE-AU 3992

| *Ex Parte* Reexamination Interview Summary | Control No. 90/007,922 *& 90/008,156* | Patent Under Reexamination 6253313 |
|---|---|---|
| | Examiner Linh M. Nguyen | Art Unit 3992 | |

All participants (USPTO personnel, patent owner, patent owner's representative):

(1) <u>Linh M. Nguyen</u>                                    (3) <u>Frederick Gluck, Scott Livingstone</u>

(2) <u>Mark Reinhart, James Menefee</u>                (4) <u>Joseph McAlexander, Kenneth Cage, Eric Shelton</u>

Date of Interview: <u>22 April 2008</u>

Type:   a)☐ Telephonic   b)☐ Video Conference
c)☒ Personal (copy given to:  1)☐ patent owner    2)☐ patent owner's representative)

Exhibit shown or demonstration conducted:   d)☐ Yes   e)☒ No.
If Yes, brief description: _____

Agreement with respect to the claims  f)☐ was reached.  g)☒ was not reached.  h)☐ N/A.
Any other agreement(s) are set forth below under "Description of the general nature of what was agreed to..."

Claim(s) discussed: <u>1-25</u>.

Identification of prior art discussed: <u>Nishikawa, Rosocha, Agerwala, and Shibuya</u>.

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:
<u>See Continuation Sheet.</u>

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims patentable, if available, must be attached.  Also, where no copy of the amendments that would render the claims patentable is available, a summary thereof must be attached.)

A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION MUST INCLUDE PATENT OWNER'S STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  (See MPEP § 2281). IF A RESPONSE TO THE LAST OFFICE ACTION HAS ALREADY BEEN FILED, THEN PATENT OWNER IS GIVEN **ONE MONTH** FROM THIS INTERVIEW DATE TO PROVIDE THE MANDATORY STATEMENT OF THE SUBSTANCE OF THE INTERVIEW (37 CFR 1.560(b)). THE REQUIREMENT FOR PATENT OWNER'S STATEMENT CAN NOT BE WAIVED. **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

cc: Requester (if third party requester)

MARK J. REINHART
CRU SPE-AU 3992                    Examiner's signature, if required

**Continuation Sheet (PTOL-474)**                                  **Reexam Control No. 90/007,922**

90/008,156

  Continuation of Description of the general nature of what was agreed to if an agreement was reached, or any other comments:  Issues discussed including: Double patenting rejection regarding claims 1 and 2, Rejections under 35 U.S.C. 102 and 103(a) regarding claims 3-25. Furthermore, Patent Owner's representatives addressed concerns regarding the Information Disclosure Statement (IDS) of November 30, 2006 as to whether lined-through items, such as declarations and court documents, have been considered. The representative is advised to direct their attention to Office Action dated 10/26/2007, page 3, section 2, lines 1-5, which indicates that these items "are evidence, but are not prior art; therefore, will not be placed on the face of the patent; such evidence is therefore inappropriate for an IDS and thus the items are lined through. The examiner notes that the evidence has been read and considered."; the IDS has been considered to the possible exent.

# EXHIBIT E

US006253313C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (6517th)

# United States Patent
Morrison et al.

(10) **Number:**       US 6,253,313 C1
(45) **Certificate Issued:**    *Nov. 11, 2008

(54) **PARALLEL PROCESSOR SYSTEM FOR PROCESSING NATURAL CONCURRENCIES AND METHOD THEREFOR**

(75) Inventors: **Gordon Edward Morrison**, Denver, CO (US); **Christopher Bancroft Brooks**, Boulder, CO (US); **Frederick George Gluck**, Boulder, CO (US)

(73) Assignee: **Equipment Investment & Management Co.**, Palm Beach Gardens, FL (US)

**Reexamination Request:**
No. 90/007,922, Feb. 9, 2006
No. 90/008,156, Oct. 20, 2006

**Reexamination Certificate for:**
Patent No.:    6,253,313
Issued:       Jun. 26, 2001
Appl. No.:     08/480,691
Filed:       Jun. 7, 1995

( * )  Notice:    This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

(62) Division of application No. 08/254,687, filed on Jun. 6, 1994, now Pat. No. 5,517,628, which is a division of application No. 08/093,794, filed on Jul. 19, 1993, now abandoned, which is a continuation of application No. 07/913,736, filed on Jul. 14, 1992, now abandoned, which is a continuation of application No. 07/560,093, filed on Jul. 30, 1990, now abandoned, which is a division of application No. 07/372,247, filed on Jun. 26, 1989, now Pat. No. 5,021,945, which is a division of application No. 06/794,221, filed on Oct. 31, 1985, now Pat. No. 4,847,755.

(51) Int. Cl.
G06F 13/00    (2006.01)
G06F 9/40    (2006.01)
G06F 9/42    (2006.01)
G06F 9/44    (2006.01)
G06F 9/45    (2006.01)
G06F 9/38    (2006.01)

(52) **U.S. Cl.** ........................ 712/226; 712/228; 712/233; 712/234; 712/E9.049; 712/E9.056; 712/E9.062; 712/E9.082; 712/E9.083

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,343,135 A    9/1967  Freiman et al.
3,577,189 A    5/1971  Cocke ........................ 712/219
3,577,190 A    5/1971  Cocke ........................ 712/226

(Continued)

FOREIGN PATENT DOCUMENTS

JP      60-110043    6/1985
JP      60-144830    7/1985

OTHER PUBLICATIONS

T.K.M. Agerwala, *New Condition Code and Branch Architecture for High Performance Processors*, IBM Technical Disclosure Bulletin, vol. 25, No. 1, pp. 135–136, Jun. 1982.
*IBM System/370 Model 168 Functional Characteristics*, IBM published manual, Sixth Edition, Jun. 1977.

(Continued)

*Primary Examiner*—Linh My Nguyen

(57)                **ABSTRACT**

A computer processing system containing a plurality of identical processor elements each of which does not retain execution state informaton from prior operations. The plurality of identical processor elements operate on a statically compiled program which, based upon detected natural concurrencies in the basic blocks of the programs, provide logical processor numbers and an instruction firing time to each instruction in each basic block. Each processor element is capable of executing instructions on a per instruction basis such that dependent instructions can execute on the same or different processor elements. A given processor element is capable of executing an instruction from one context followed by an instruction from another context through use of shared storage resources.



# US 6,253,313 C1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,611,306 | A | 10/1971 | Reigel et al. |
| 3,771,141 | A | 11/1973 | Culler ........................ 712/203 |
| 3,833,889 | A | 9/1974 | Cray ........................... 712/220 |
| 4,104,720 | A | 8/1978 | Gruner |
| 4,109,311 | A | 8/1978 | Blum et al. |
| 4,153,932 | A | 5/1979 | Dennis et al. |
| 4,181,936 | A | 1/1980 | Kober |
| 4,228,495 | A | 10/1980 | Bernhard et al. |
| 4,229,790 | A | 10/1980 | Gilliland et al. |
| 4,241,398 | A | 12/1980 | Carll |
| 4,270,167 | A | 5/1981 | Koehler et al. |
| 4,295,193 | A | 10/1981 | Pomerene ................... 712/215 |
| 4,435,758 | A | 3/1984 | Lorie et al. |
| 4,466,061 | A | 8/1984 | Desantis et al. |
| 4,468,736 | A | 8/1984 | Desantis et al. |
| 4,589,087 | A | 5/1986 | Auslander ................... 708/670 |
| 4,742,453 | A | 5/1988 | Shibuya |
| 4,847,755 | A | 7/1989 | Morrison ................... 712/234 |
| 5,021,945 | A | 6/1991 | Morrison ................... 712/234 |
| 5,517,628 | A | 5/1996 | Morrison |
| 6,253,313 | B1 | 6/2001 | Morrison et al. |
| 6,704,859 | B1 | 3/2004 | Jacobs ........................ 712/237 |

## OTHER PUBLICATIONS

*IBM System/370 RPQ High Accuracy Arithmetic*, IBM Publication No. SA22–7093–0.

File Wrapper to the '313 patent.

File Wrapper to U.S. Appl. No. 08/914,077. (1—Office Action mailed Aug. 4, 1998; 2—Final Office Action mailed May 10, 1999; 3—Complete File Wrapper of U.S. Appl. No. 08/914,077).

BIAX Corporation's Opening Claim Construction Brief filed Feb. 25, 2003 in the litigation *BIAX Corporation v. Apple Computer, Inc., et al.* No. 01–601–KAJ (Del. 2001).

Claim Chart for claims 3–25 of the '313 patent in view of Shibuya, and further view of Agerwala.

Claim Chart for claims 3–25 of the '313 patent in view of Agerwala, and further view of the IBM System/370 manual.

Walter G. Rosocha, *Adaptive Microprogramming and Processor Modelling*, Technical report CSRG–96. The Computer Systems Research Group, University of Toronto, Aug. 1978.

CDC Control Data 7600 Computer System Preliminary Reference Manual, Publications No. 60258200, 1969.

Cray Computer Systems, Cray–2 Computer System Functional Description, HR–2000, 1985.

Dasgupta, Subrata, *The Organization of Microprogram Stores*, Simon Fraser University, Burnaby, Canada, 1979.

Dasgupta, Subrata, *Some Aspect of High Level Microprogramming*, University of Alberta, 1980.

Digital Equipment Corp., DECsystem–10/DECSYSTEM–20 Processor Reference manual AD–H391A–T1.

Ellis, John R., *Bulldog: A Compiler for VLIW Architectures*, Yale University, 1985.

Fisher, Joseph A. *Very Long Instruction Word Architectures and the ELI–512*, Hewlett–Packard Laboratories, Jun. 1983.

Gross, Thomas Karl Richard, *Code Optimization of Pipeline Constraints*, Stanford University, 1983.

Hennessy, John, *VLSI Processor Architecture*, IEEE Transactions on Computers, Dec. 1984.

Honeywell, Inc., *Honeywell 800 Programmers' Reference Manual*, 1960.

Hoogerbrugge, Jan, *Internals of tmsched v2.0*, Phillips Electronics N.V. 1997.

Kowalik, *Parallel MIMD Computations HEP Supercomputer and Its Applications*, MIT Press, 1985.

Kraley, Michael, Rettberg, Philip Herman, Robert Bressler and Anthony Lake, *Design of a User–Microprogrammable Building Block*, Computer Systems Division.

Landskov, David, Scott Davidson, and Bruce Shriver, *Local Microcode Compaction Techniques*, Computing Surveys, Sep. 1980.

Mahike, Scott, Richard E. Hank, James E. McCormick, David I. August and Wen–mei Hwu, *A Comparison of Full and Partial Predicated Execution Support for ILP Processors*, Center for Reliable and High–Performance Computing, University of Illinois, Jun. 1995.

Marti, Jed B. and Robert R. Kessler, *A Medium Level Compiler Generating Microcode*, University of Utah, 1979.

McDowell, Charles. "A simple architecture for low level parallelism" Proceedings of the 1983 International Conference on Parallel Processing. Aug. 23–26, 1983.

McDowell, Charles, *SIMAC: A Simple Multiple ALU Computer*, University of California San Diego, 1983.

Nicolau, Alexandru, *Parallelism, Memory Anti–Aliasing and Correctness for Trace Scheduling Compliers*, Yale University, 1984.

Pol, E.J.D., P. Struik, F. W. Sijstermans, M.J.A. Tromp, J.W. van de Waerdt and P. van der Wolf, *TriMedia CPU64 Application Development Enviornment*, Philips Research Laboratories, 1999.

Rau, B. Ramakrishna, *Levels of Representation of Programs and the Architecture of Universal Host Machines*, University of Illinois, Irbana, Il. 1978.

Radin, George, *The 801 Minicomputer*, 1982.

Rideout, Douglas J., *Considerations for Local Compaction of Nanocode for the Nanodata QM–1*, University of Alberta.

Rosin, Roberta F., Gideon Frieder and Richard H. Eckhouse Jr., *An Environment for Research in Microprogramming and Emulation*, State University of New York at Buffalo, 1972.

Rosocha, Walter G., *Adaptive Microprogramming and Processor Modelling*, Technical Report CSRG–96, Aug. 1978.

Rosocha, Water, *Performance Enhancement of SISD Processors*, Computer Systems Research Group, 1979.

Schorr, H., *Design Principles for a High–Performance System*, Polytechnic Institute of Brooklyn, 1971.

Stone, Harold S. *Introduction to Computer Organization and Data Structures*, Stanford University, 1972.

Thornton, James E., Design of a Computer the Control Data 6600, Scott, Foresman and Company, 1970.

Tomita, Shinji, Kiyoshi Shibayama, Toshiaki and Hiroshi Hagiwara, *Performance Evaluation and Improvement of a Dynamically Microprogrammable Computer with Low–Level Parallelism*, Kyoto University, 1980.

US 6,253,313 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

### THE PATENT IS HEREBY AMENDED AS
### INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentablity of claims 1–25 is confirmed.

New claims 26 and 27 are added and determined to be patentable.

*26. In an instruction processing apparatus, a system for using multiple sets of condition values within a single context, the system comprising:*

*an opcode storage configured to buffer a plurality of opcodes corresponding to at least some of said instructions to be processed from said context, wherein said opcode storage comprises a processor instruction queue, said queue configured to buffer instructions waiting to be executed and to track the execution status of instructions that are issued;*

*a first circuit coupled to said opcode storage, said first circuit configured to receive opcodes of a first type of instruction and addresses for storing sets of at least one condition value, and to generate for each said opcode of said first type a set of at least one condition value associated with one of the addresses;*

*a condition storage coupled to said first circuit, said condition storage configured to store a plurality of said sets of condition values at storage locations based upon addresses received from the first circuit;*

*a second circuit coupled to said opcode storage, said second circuit configured to receive opcodes of a second type of instruction and condition storage addresses, and to generate a set of at least one output value, said*

**2**

*output value for each said second type of instruction depending on a particular one of said stored sets of condition values associated with the condition storage address; and*

*an access circuit coupled between said condition storage and said second circuit, said access circuit configured to access by the condition storage address said particular one of said stored sets of condition values for each said opcode of said second type.*

*27. In an instruction processing apparatus, a system for using multiple sets of condition values within a single context, the system comprising:*

*an opcode storage configured to buffer a plurality of opcodes corresponding to at least some of said instructions to be processed from said context;*

*a first circuit coupled to said opcode storage, said first circuit configured to receive opcodes of a first type of instruction and addresses for storing sets of at least one condition value, and to generate for each said opcode of said first type a set of at least one condition value associated with one of the addresses;*

*a condition storage coupled to said first circuit, said condition storage configured to store a plurality of said sets of condition values at storage locations based upon addresses received from the first circuit;*

*a second circuit coupled to said opcode storage, said second circuit configured to receive opcodes of a second type of instruction and condition storage addresses, and to generate a set of at least one output value, said output value for each said second type of instruction depending on a particular one of said stored sets of condition values associated with the condition storage address; and*

*an access circuit coupled between said condition storage and said second circuit, said access circuit configured to access by the condition storage address said particular one of said stored sets of condition values for each said opcode of said second type,*

*wherein said sets of condition valve are stored as condition codes, each said condition code comprising a plurality of flag bits.*

* * * * *

# CIVIL COVER SHEET

≈JS 44 (Rev. 12/07)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Biax Corporation, a Colorado Corporation

**DEFENDANTS**
Motorola, Inc., Hewlett-Packard Company, Cisco Systems, Inc., Canon U.S.A., Inc., Canon, Inc., Brother International Corp.; Brother Industries, LTD., Ricoh Americas Corp. and Ricoh Company LTD.

**(b)** County of Residence of First Listed Plaintiff   Denver, Colorado
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Cook County Illinois
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Faegre & Benson LLP, 3200 Wells Fargo Center, 1700 Lincoln Street, Denver, Colorado 80203 (303) 607-3500

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☒ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | 26 USC 7609 | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
35 U.S.C. § 271
Brief description of cause:
Infringement of the 5,517,628 and 6,253,313 Patents

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE  Philip A Brimmer
DOCKET NUMBER  1:09-cv-01257

DATE
12/13/2010

SIGNATURE OF ATTORNEY OF RECORD
s/ Natalie Hanlon-Leh

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

JS 44 Reverse (Rev. 12/07)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.      **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.     **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.      **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI.     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: 47 USC 553
                                                 Brief Description: Unauthorized reception of cable service

VII.    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

```
Court Name: U.S. District Court, Colorad
o
Division: 1
Receipt Number: COX033665
Cashier ID: sq
Transaction Date: 12/14/2010
Payer Name: FAEGRE BENSON
-----------------------------------
CIVIL FILING FEE
 For: FAEGRE BENSON
 Amount:       $350.00
-----------------------------------
CREDIT CARD
 Amt Tendered: $350.00
-----------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:    $0.00

10-CV-3013


A fee of $45.00 will be assessed on
any returned check.
```